**WILSON & WILSON TAX SERVICES, INC., Billy R. Wilson, and Jerome Carter a/k/a Jerome Carter, Sr., Appellants**

v.

**Hayden MOHAMMED and Nazreen Mohammed, Appellees.**

No. 14–02–00086–CV.

Court of Appeals of Texas, Houston (14th Dist.).

Feb. 19, 2004.

Helen A. Cassidy, Theodore R. Andrews and Richard N. Countiss, Houston, for appellants.

Jeffrey A. Hirt, Houston, for appellees.

Helen A. Cassidy, for Jerome Carter a/k/a Jerome Carter.

Panel consists of Justices JOHN S. ANDERSON, EDELMAN, and SEYMORE.

## OPINION

JOHN S. ANDERSON, Justice.

Billy R. Wilson and Jerome Carter appeal from an adverse judgment notwithstanding the verdict and a directed verdict in Hayden and Nazreen Mohammed's law-

suit against them.[1] In four issues, Wilson contends the Mohammeds failed to prove as a matter of law that they were entitled to judgment notwithstanding the verdict. In three issues, Carter contends the evidence supports the jury's findings and the Mohammeds were not entitled to judgment notwithstanding the verdict. In a fourth issue, Carter contends the trial court improperly directed a verdict on the promissory note and erred in refusing to submit requested defensive instructions on that issue. Because the trial court erred in entering a judgment notwithstanding the verdict, we reverse and render judgment based on the jury's verdict. Because the trial court erred in directing a verdict against Carter on the issue of the promissory note, we reverse and remand for determination of that issue.

## I. Background[2]

Jerome Carter is an investment banker, a position he held for more than fourteen years. At the time of the transaction made the basis of this suit, he was an officer of Trust Investment Group ("TIG") and handled financial transactions for the company. TIG was a fee-based business facilitator that connected investors with people or companies needing financing. Wilson was a tax accountant, who performed various accounting functions for TIG, including helping it qualify to do business in Texas and opening a checking account in its name, on which he was authorized to write checks.

The transaction involved in the present lawsuit began as an investment in a commodity transaction to purchase Nike tennis shoes in South America, transport them to Asia, and sell them "at a tremendous markup." The Mohammeds were investors and TIG was handling the financing for the purchaser of the tennis shoes, Global Commodities.

In early 1997, Nazreen Mohammed's brother, Samuel Alie, was working with Eddie Tang. Tang, who was associated with a company in Trinidad and Tobago, had been in contact with Carter regarding financing, through TIG, for a construction project. Tang asked Carter if TIG needed investors for any other projects. Carter responded that there was a possible commodity deal (the Nike investment) that was available as a joint venture. Alie called Nazreen, told her about the opportunity, and encouraged her to invest. The Mohammeds invested some of their own money along with money they borrowed from various friends and relatives. On February 28, 1997, the money was deposited in a TIG bank account set up by Wilson.[3]

A meeting took place between the Mohammeds, Alie, Tang, Carter, Wilson, the man who owned Global Commodities (Sajjad Sheekh a.k.a. Jack Perez), and other interested persons, including Gautum

---

1. Two other defendants, Wilson & Wilson Tax Services, Inc., and Trust Investment Group, S.A., were named in the lawsuit. The trial court imposed liability on the latter in a directed verdict, but did not impose any liability on the former. Wilson's opening brief asserts the Mohammeds have waived liability as to Wilson & Wilson by failing to perfect an appeal as to that entity, and the Mohammeds' responsive brief does not address the issue. We conclude Wilson & Wilson is not a party to this appeal.

2. Appellees do not dispute the basic factual presentation contained in appellants' briefs, nor do they offer their own version. Accordingly, because they are supported by record references, we accept appellants' versions. *See* TEX.R.APP. P. 38.1(f).

3. The Mohammeds claim they sent a total of approximately $180,000 to TIG.

Roy and Shulekha Chandra. Chandra was Nazreen's sister, and, together with Roy, she owned Royko, a company that was created for investment in the tennis shoe commodity transaction.[4] At the meeting, the participants agreed to go forward with the deal. The plan called for the group led by the Mohammeds to evenly divide the proceeds with TIG; Alie was to receive a ten percent commission; and another $150,000 was to go to the Trinidad and Tobago company associated with Eddie Tang, as a broker's fee. Once profits were received they were to be returned to TIG's account and disbursed to the investors. Roy told Carter to transfer $160,000 of the investors' funds to Global Commodities to enable it to purchase the tennis shoes. Carter then told Wilson to use the investors' funds in the TIG account to buy a cashier's check. Wilson did so and gave the check to Carter, who, in turn, gave it to Global Commodities. Global Commodities received the money, but nothing was ever returned to TIG.

When the Mohammeds inquired about their investment, Carter and Wilson signed an undated document containing the following handwritten words: "Payment Amount: $200,000 [and] We agree to transmit the above amount."[5] The document also included Nazreen Mohammed's name, address, bank name, bank account number, and bank address. No money was ever sent pursuant to this document. It was to serve as the basis of the Mohammeds' breach of contract claims against Wilson and Carter. A very similar document, similarly described as a wire transfer, also appears in the record. This document was plaintiffs' trial exhibit 5, and provides instructions to a Mr. Cuellar to wire transfer $200,000 upon completion of the monetization of the stand-by letter of credit. The banking coordinates, dollar amount, bank and bank account number all match the wire transfer document. The document is dated October 12, 1998, and bears the signatures of Carter and Nazreen. This document will be referred to as the October 12, 1998 wire transfer to distinguish it from the undated wire transfer document.

In May 1997, the Mohammeds, along with Roy, arrived at Carter's home unannounced. At this meeting, Carter signed a promissory note, payable to Nazreen and Royko, for $193,000. Below Carter's signature and his address is the notation "on behalf of [TIG]." The body of the note states "I, We or either of us promise to pay . . . ." No money was ever paid on the note.[6]

The Mohammeds filed the present lawsuit against TIG, Carter, and Wilson for fraud, breach of contract, corporate officer liability, and default on a promissory note. At the charge conference, the court directed a verdict against Carter and TIG on the promissory note. At the conclusion of trial, the jury found no liability against either Carter or Wilson on fraud, breach of contract, or corporate officer liability. The jury found liability only against TIG for $30,000 based on fraud. The trial court granted the Mohammeds' motion for judgment notwithstanding the verdict ("JNOV"), and awarded judgment solely against Carter and Wilson.

**4.** Chandra, Roy, and Royko were apparently brought into the transaction by the Mohammeds.

**5.** This document is entitled "U.S. Dollar Account," and will be referred to throughout this opinion as the "wire transfer document."

During trial it was designated Plaintiffs' Exhibit 8. It is attached to this opinion as Appendix A.

**6.** The note is attached to this opinion as Appendix B.

## II. JNOV Standard of Review

A judgment notwithstanding the verdict is reviewed under the same standard as a directed verdict. *Rush v. Barrios*, 56 S.W.3d 88, 94 (Tex.App.-Houston [14th Dist.] 2001, pet. denied). In reviewing whether the trial court's JNOV was proper, we must view the evidence in favor of Wilson and Carter and determine whether that evidence supports the jury's verdict. *See Exxon Corp. v. Quinn*, 726 S.W.2d 17, 19 (Tex.1987). "No evidence" exists, and a JNOV should be entered when the record discloses one of the following: (1) a complete absence of a vital fact; (2) the court is barred by rules of law or evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a scintilla of evidence; or (4) the evidence establishes conclusively the opposite of a vital fact. *See Juliette Fowler Homes, Inc. v. Welch Assocs., Inc.*, 793 S.W.2d 660, 666 n. 9 (Tex.1990); *Rush*, 56 S.W.3d at 94. When there is more than a scintilla of competent evidence to support the jury's finding, the JNOV should be reversed. *Mancorp, Inc. v. Culpepper*, 802 S.W.2d 226, 228 (Tex.1990); *Rush*, 56 S.W.3d at 94–95.

Although Wilson and Carter filed separate briefs, two of their issues, fraud and breach of contract, overlap and will be discussed together.

## III. Fraud

In Wilson's second issue and Carter's first issue, appellants contend the evidence supports the jury's finding that they did not commit fraud and thus the trial court erred if it granted JNOV on that basis. In their brief, appellees concede fraud is irrelevant to appellants' liability to appellees. The Mohammeds' position is supported by the fact that the damages awarded by the trial court, $200,000 in actual damages plus attorney's fees, are damages for breach of contract and not fraud.[7]

If, however, the trial court based the JNOV on the fraud claim, we find there was more than a scintilla of evidence to support the jury's finding Wilson did not commit fraud. The charge essentially tracked the elements of common law fraud: (1) a material misrepresentation; (2) that was false and was either known to be false when made or was asserted without knowledge of its truth; (3) that was intended to be acted upon; (4) that was relied upon; and (5) that caused injury. *Formosa Plastics Corp. USA v. Presidio Engineers and Contractors, Inc.*, 960 S.W.2d 41, 47 (Tex. 1998) (citing *Sears, Roebuck & Co. v. Meadows*, 877 S.W.2d 281, 282 (Tex.1994)). Appellants contend there was more than a scintilla of evidence to negate the reliance element of fraud. Specifically, the Mohammeds both testified that they relied on representations from Samuel Alie, and not on any representations by Wilson or Carter, in entering the transaction made the basis of this lawsuit. Alie did not testify. The Mohammeds' testimony was sufficient for the jury to determine that the Mohammeds failed to prove the element of reliance. *See Hendricks v. Thornton*, 973 S.W.2d 348, 360–62 (Tex.App.-Beaumont

---

7. The Mohammeds alleged in their petition that they contributed approximately $180,000 to the transaction not $200,000, but the wire transfer document references the amount of $200,000. *See* Appendix A. Furthermore, attorney's fees are recoverable under a breach of contract action but generally not under a claim for common law fraud. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 38.001 (Vernon 1997) (permitting recovery of attorney's fees in contract actions); *Cantu v. Butron*, 921 S.W.2d 344, 354 (Tex.App.-Corpus Christi 1996, writ denied) (stating that plaintiffs generally do not recover attorney's fees under common law fraud).

1998, pet. denied) (holding testimony by plaintiffs they relied on third party representations and not those of defendant negated reliance element). We conclude there was more than a scintilla of evidence to support the jury's findings that Carter and Wilson did not commit fraud. The trial court erred if it based the JNOV on the existence of fraud. *See Mancorp, Inc.,* 802 S.W.2d at 228 (holding when there is more than a scintilla of evidence to support the jury's findings, a JNOV should be reversed); *Rush,* 56 S.W.3d at 95. We sustain Carter's first issue and Wilson's second issue.

### IV. Breach of Contract

In Wilson's first issue and Carter's second issue, appellants contend the trial court erred in entering a JNOV holding the wire transfer document to be an enforceable contract and finding that appellants breached the contract. *See* appendix A (the wire transfer document). In answer to question 12, the jury found there was no agreement between Wilson and the Mohammeds for Wilson to send them $200,000. Curiously, while submission of the contract issue was identical, except for their names, in regard to both Carter and Wilson, the jury found an agreement existed between Carter and the Mohammeds, whereas it found no agreement between Wilson and the Mohammeds. Regardless, the jury also found that Carter did not breach the agreement between himself and the Mohammeds. Despite the jury's answers, the trial court entered a JNOV, apparently concluding the evidence conclusively demonstrated both the existence of an agreement and the breach thereof by Wilson and Carter.

### 1. Existence of an Agreement

The wire transfer document is somewhat of an enigma. It bears no date, no date of performance, and is silent as to what consideration supports Wilson's promise to pay $200,000 to Nazreen. During trial, Nazreen was allowed to testify that the correct date of the wire transfer document was March 11,1997 which, she testified, was her birthday.

██ Whether a contract is ambiguous is a question of law for the court to decide by looking at the contract as a whole in light of the circumstances present when the contract was entered. *Coker v. Coker,* 650 S.W.2d 391, 394 (Tex.1983). A written instrument is ambiguous when its meaning is uncertain or doubtful. *Id.* at 393. When a contract contains an ambiguity, the interpretation of the instrument becomes a fact issue. *Id.* at 394. The trial court apparently considered the wire transfer document to be ambiguous, thus permitting Nazreen's parol evidence to clarify the document. Here, the wire transfer document explicitly provides that Wilson and Carter "agree" to transfer $200,000 to Nazreen, but without a date on the instrument, it is doubtful and uncertain as to when that obligation matured.

██ Consistent with the trial court's implied question of law determination the wire transfer document was ambiguous, and therefore susceptible to interpretation with parol evidence, Wilson testified the obligation to send the $200,000 was contingent on the presence of funds in the account adequate to satisfy the obligation. Specifically, Wilson testified he did not send money to Nazreen because the TIG account never had funds available for transfer. He stated the wire transfer document was merely his instruction from Carter to send money after it reached the TIG account. Wilson emphatically testified he never represented to any person that he agreed to send personal funds.

■ During cross-examination, Nazreen, in response to a question regarding the appropriate date of performance under the wire transfer document, testified as follows:

> Q. That document [wire transfer document, plaintiffs' exhibit 8] that says $200,000 does not say within 30 days, does it?
>
> A. No, sir. That was supposed to be paid upon receipt or as soon as possible. *As soon as they funded the letter of credit and they had the money* they were going to send off the $200,000 to us immediately so that we could cover all the loans that we had taken to fund this letter of credit. (emphasis added)

The foregoing testimony by Nazreen is consistent with Wilson's testimony there was no agreement to pay the $200,000 until all the funds from the investment had been returned. Both Wilson and Nazreen testified that performance of the duty to pay in accordance with the wire transfer document was conditioned on the availability of funds in the TIG account. The funds could only be provided by a third party.

■ A condition precedent in the law of contracts may be either a condition that must be performed before the agreement can become a binding contract, or it may be a condition that must be fulfilled before the duty to perform an existing contract arises. *City of Houston v. West*, 563 S.W.2d 680, 684 (Tex.Civ.App.-Waco 1978, writ ref'd n.r.e.). Where the parties to a written agreement agree orally that performance of the agreement is subject to the occurrence of a stated condition, the agreement is not integrated with respect to the oral condition. RESTATEMENT SECOND OF CONTRACTS § 217. Wilson's promise to pay $200,000 was not, standing alone, a binding contract. The condition requiring funds in the account went to the existence of the contract. Upon proof by Nazreen that the money was in the account, the contract would come into existence. *See* RESTATEMENT (SECOND) OF CONTRACTS § 224.

Where more than a scintilla of evidence supports the jury finding Wilson did not agree with the Mohammeds to send $200,000, the finding must be upheld. *Garcia v. Ins. Co. of Pa.*, 751 S.W.2d 857, 858 (Tex.1988). The testimony of Nazreen and Wilson constitutes more than a scintilla of evidence the wire transfer document was subject to a condition that never occurred. Such evidence supports the jury finding Wilson did not agree to send $200,000, and simultaneously vitiates the JNOV. Accordingly, we sustain Wilsons' first issue.

## 2. Breach of the Agreement

■ In his second issue, Carter contends the evidence supports the jury's finding he did not breach a contract (the wire transfer document) with the Mohammeds. The party seeking to recover under a contract has the burden of proving that all conditions precedent have been satisfied. *Associated Indem. Corp. v. CAT Contracting, Inc.*, 964 S.W.2d 276, 283 (Tex.1998).[8] Extrinsic evidence is admissi-

---

8. Under Rule 54 of the Texas Rules of Civil Procedure, a party need not prove the performance or occurrence of conditions precedent when it avers generally in its pleadings that all conditions precedent have been performed or have occurred, and the opposing party does not specifically deny that all such conditions have been performed or occurred. TEX.R. CIV. P. 54. In their First Amended Petition, the Mohammeds stated "All conditions precedent for and to the receipt of their consideration have been performed by Plaintiffs"[sic]. This averment is defective. First, the Mohammeds' pleading references a wire transfer dated October 12, 1998, not the undated Exhibit 8, the wire transfer document at issue in this appeal. Second, because the condition precedent alleged at trial by Wilson,

ble to establish an oral condition precedent if it is consistent with the terms of the written agreement. *Castroville Airport, Inc. v. City of Castroville*, 974 S.W.2d 207, 211 (Tex.App.-San Antonio 1998, no pet.); *Litton v. Hanley*, 823 S.W.2d 428, 430–31 (Tex.App.-Houston [1st Dist.] 1992, no writ).

 The existence of an oral condition precedent requiring the TIG account to contain money prior to any transmission of funds out of the account is consistent with the terms of the wire transfer document. Further, there was evidence to support the conclusion the condition precedent to Carter's promise was never satisfied. Accordingly, we find there is more than a scintilla of evidence supporting the jury's finding Carter did not breach an agreement with the Mohammeds to send them $200,000. We sustain Carter's second issue.

## V. Wilson's Issues

### A. Corporate Officer Liability

In his third issue, Wilson contends the Mohammeds did not prove, as a matter of law, that he was an officer of TIG on or after the date on which the company lost its corporate privileges, and thus, he cannot be held liable for the company's debts. The Mohammeds pled a cause of action against Wilson based on officer liability, and the jury charge included a question on the issue, but the jury found Wilson was not an officer of TIG. Section 171.255(a) of the Texas Tax Code states

If the corporate privileges of a corporation are forfeited for the failure to file a report or pay a tax or penalty, each director or officer of the corporation is liable for each debt of the corporation that is created or incurred in this state after the date on which the report, tax, or penalty is due and before the corporate privileges are revived.

TEX. TAX CODE ANN. § 171.255(a) (Vernon 2002). Evidence at trial demonstrated TIG became delinquent on November 5, 1997, for failure to pay the franchise tax. It lost corporate privileges on March 3, 1998. The jury found that Wilson was not an officer of the company after November 5, 1997.

In their appellate brief, the Mohammeds, as they did with the fraud issue, expressly deny the JNOV against Wilson was granted on the officer liability issue, stating instead that it was granted solely on the breach of contract (wire transfer document) cause of action. This position is supported by the damages awarded by the trial court. The only damages expressly found by the jury against TIG, based on officer liability, were $30,000 based on the jury's finding of fraud. The court, however, awarded $200,000 against Wilson, which would be consistent with the breach of contract cause of action.

 Substantively, if the damages assessed against Wilson in the JNOV were based on officer liability, we find the record contains evidence supporting either conclusion: that Wilson was an officer at the relevant time, or was not. Specifically, the main evidence suggesting Wilson may have been an officer is a notation on an Application for Certificate of Authority filed with the Texas Secretary of State's office. Below Wilson's signature on this document is the term "Authorized Officer." However, elsewhere in the same docu-

the deposit of sufficient funds in the TIG account, was to be performed by a third party, for whom the plaintiffs could not speak, and not the plaintiffs, the averment did not cover that condition. Consequently, we do

not address the issue as to whether the condition precedent to the wire transfer document was properly and specifically denied by the defendants.

ment, where it calls for a listing of [t]he names and addresses of [t]he company's officers and directors, Wilson's name is not listed. Furthermore, Wilson testified at trial that the indication he was an officer on the application was in error and that he was not an officer of TIG at that time and had never been an officer of TIG. Wilson also presented his own exhibit, entitled "Corporate Authorization Resolutions." Although Wilson signed this document on behalf of the company, following his name is the notation "Not an Officer." Thus, we find that these two documents along with Wilson's testimony amount to more than a scintilla of evidence to support the jury's determination that Wilson was not an officer at the relevant time. Accordingly, we hold the trial court erred if it based the JNOV on officer liability. *See Mancorp, Inc.*, 802 S.W.2d at 228; *Rush*, 56 S.W.3d at 95. We sustain Wilson's third issue.

### B. Attorney's Fees

In his fourth issue, Wilson contends the Mohammeds are not entitled to attorney's fees, but he is. He is half right. The Mohammeds acknowledge in their brief that if they are not successful on their breach of contract claim they are not entitled to attorney's fees. A party has to win its breach of contract claim in order to recover attorney's fees based on that issue. *See Green Int'l, Inc. v. Solis*, 951 S.W.2d 384, 390 (Tex.1997) (citing Texas Civil Practice & Remedies Code Section 38.001(8) in holding that to recover attorney's fees on a contract action a party must prevail and recover damages). Because we reverse the JNOV on the breach of contract issue, we must also reverse the award of attorney's fees to the Mohammeds. We sustain Wilson's fourth issue to the extent it challenges the attorney's fees awarded to the Mohammeds.

Wilson further requests under this issue that he be awarded the $7,500 that the jury found was a reasonable fee for the services of his attorney. His entire argument consists of the following unsupported statement: "Conversely, Wilson is entitled to recover the $7,500 in attorney's fees awarded to him [by the jury] because he is entitled to the rendition of judgment in his favor." Section 38.001 of the Texas Civil Practice and Remedies Code provides that any person may recover reasonable attorneys' fees in addition to the amount of a valid claim and costs for suits involving breach of contract. TEX.CIV.PRAC. & REM. CODE § 38.001 (Vernon 1986). The statute makes no reference to awarding attorneys' fees to the defendant for the successful defense of a contractual lawsuit. *See Ventana Investments v. 909 Corp.*, 879 F.Supp. 676, 678 (E.D.Tex.1995). Counsel for the parties have cited no Texas case that permits such fees, and this court has been unable to locate one. We overrule Wilson's issue four to the extent it seeks recovery of attorney's fees awarded him by the jury.

## VI. Carter's Issues

### A. The Promissory Note

In his fourth issue, Carter contends the trial court erred in refusing to submit requested defensive issues regarding the promissory note. *See* Appendix B (the promissory note). In the alternative, Carter argues the trial court erred in granting a directed verdict on the promissory note. We will address the challenge to the directed verdict first because if it is valid, we need not address the challenges to the trial court's rulings on the defensive issues.

### 1. Directed Verdict

During the charge conference, after the conclusion of the evidentiary portion of the

trial, the court stated, "We have no issues as to the promissory note because I find as a matter of law that [Carter] admitted to signing the promissory note." During the hearing on the motion for JNOV, Mr. Hirt, counsel for the Mohammeds, stated:

I have an inquiry to make with regard to the promissory note. I believe the Court did not present the promissory note issue to the jury because I believe Your Honor's words were, "there is no issue. He admitted he signed it." To prepare my judgment, I would ask if it's—the Court on its own motion for directed verdict, which was my perception is how the Court ruled on it, does the Court find that Mr. Carter and the corporation are both liable on the promissory note?

COURT: I think that's what I said, isn't it?

MR. HIRT: I believe so Your Honor. I just wanted to clarify that before I prepared the judgment with regard to the promissory note.

COURT: Okay.

Further, in response to Carter's counsel's comment regarding the lack of a motion for directed verdict on the promissory note, the Court stated: "I thought we did it in the charge conference. I thought that was my ruling. You asked for it to be submitted and I said no, that I'm ruling as a matter of law that they were liable on the note." It is undisputed that the trial court ruled as a matter of law Carter and TIG are liable on the promissory note.

Carter contends, however, that the trial court erred in holding as a matter of law that he was individually liable on the promissory note because the facts do not support the directed verdict. The Mohammeds respond with counter-points making the bare assertion Carter did not plead failure of consideration for the promissory note.

## 2. Standard of Review

■ A directed verdict is proper when: (1) a defect in the opponent's pleading renders it insufficient to support a judgment; (2) the evidence conclusively proves a fact that establishes a party's right to judgment as a matter of law; or (3) the evidence offered on a cause of action is insufficient to raise an issue of fact. *Knoll v. Neblett*, 966 S.W.2d 622, 627 (Tex.App.-Houston [14th Dist.] 1998, pet. denied). When reviewing a motion for directed verdict, we consider all the evidence in the light most favorable to the nonmovant, disregard all evidence and inferences to the contrary, and give the nonmovant the benefit of all inferences arising from the evidence. *Mayes v. Stewart*, 11 S.W.3d 440, 450 n. 4 (Tex.App.-Houston [14th Dist.] 2000, pet denied). In this review, we must determine whether there is evidence of probative value to raise a fact issue on the material question presented. *Kline v. O'Quinn*, 874 S.W.2d 776, 785 (Tex.App.-Houston [14th Dist.] 1994, writ denied). If there is any conflicting evidence of probative value on any theory of recovery, an instructed verdict is improper and the case must be reversed and remanded for jury determination of that issue. *Szczepanik v. First Southern Trust Co.*, 883 S.W.2d 648, 649 (Tex.1994).

## 3. Conflicting Evidence

Carter testified as follows regarding the promissory note:

Q. And in regards to this promissory note that you executed while the Mohammed family was in your home, did you receive any payment in connection with the execution of that promissory note?

A. No, I did not.

Q. Did you receive any other type of money whatsoever to prompt you to issue that promissory note?

A. No, I did not.

Q. Did you receive any consideration from the Global Commodities Royko deal to prompt you to issue that promissory note?

A. No, I did not.

Q. Did you consider yourself personally responsible to Mrs. Mohammed and the Royko Group for the return of their investment?

A. No, I did not.

\* \* \* \* \* \*

Q. At the meeting at the Hawthorn Suites, did you personally ever guarantee anybody's investment?

A. No, I did not.

Q. Did you personally represent to anyone at that meeting that they would get their money back?

A. No, I did not.

 The promissory note, however, recites on its face "For Value Received." The promissory note was introduced at trial as plaintiffs' exhibit 9. Thus, at the time the trial court directed a verdict for the Mohammeds on the promissory note, there was conflicting evidence on the issue of consideration supporting the promissory note.

The trial court erred as a matter of law in directing a verdict against Carter and TIG on the promissory note because there was conflicting evidence of probative value on the Mohammeds' theory that Carter was liable on the promissory note. A contract in which there is no consideration moving from one party, or no obligation upon him, lacks mutuality, is unilateral, and unenforceable. *Texas Farm Bureau Cotton Ass'n v. Stovall,* 113 Tex. 273, 253 S.W. 1101, 1105 (1923). The conflicting

evidence on this issue vitiates the instructed verdict on the promissory note and mandates a remand to the jury for determination of the issue of whether the promissory note can be enforced against Carter and TIG.

The Mohammeds' bare statement of fact in their brief, replying to Carter's arguments, that Carter did not plead failure of consideration is just that: a mere statement of counsel which lacks any related argument, fails to cite any authority, or analyze the consequences of such failure. The appellate procedure briefing rules require the Mohammeds to provide us with such discussion of the facts and the authorities relied upon as may be requisite to maintain the point at issue. *Franklin v. Enserch, Inc.,* 961 S.W.2d 704, 711 (Tex. App.-Amarillo 1998, no pet.). This is not done by merely uttering brief conclusory statements unsupported by any legal citation or argument. *Id.* By failing to comply with Appellate Procedure Rule 38.1(h), the Mohammeds' counter-point to Carter's fourth issue is waived. Tex.R.App. P. 38.1(h). Moreover, we will not speculate as to the arguments that could have been brought, or attempt to make those arguments for them. We sustain Carter's fourth point of error.

**B. Corporate Officer Liability**

In his third issue, Carter contends he is not liable for the debts of TIG. In response, the Mohammeds state Carter is not being held liable for the debts of TIG, rather he is liable to the plaintiffs in his individual capacity only based on the promissory note. We have held the directed verdict holding Carter and TIG liable on the promissory note was error, and we will remand for jury determination of the issue of whether the note can be enforced against Carter individually, and TIG. Because the Mohammeds have not brought a

cross-point on appeal addressing the issue of Carter's liability for the debts of TIG, which would require the taking of evidence, remand of that issue is not warranted. *See* Tex.R.App. P. 38.2(b)(2)(B). Accordingly, the remand of the issue of whether consideration supports the promissory note will be limited to that issue and the issue of whether Carter is individually liable thereon.

## VII. Conclusion

### A. Wilson

On the issue of whether Wilson committed fraud, we reverse the judgment to the extent it imposed liability on Wilson for fraud on the Mohammeds, and render judgment on the jury verdict.

On the issue of whether Wilson was legally obligated to send $200,000 to Nazreen, we reverse the judgment to the extent it imposed liability on Wilson for the wire transfer document and associated interest, and render judgment on the jury verdict.

On the issue of Wilson's liability to the Mohammeds based on his alleged status as an officer of TIG, we reverse the judgment to the extent it imposed liability on Wilson and render judgment on the jury verdict.

On the issue of attorney's fees, we reverse the judgment to the extent it imposed attorney's fees on Wilson in favor of the Mohammeds, and overrule Wilson's request for attorney's fees.

### B. Carter

On the issue of whether Carter committed fraud, we reverse the judgment to the extent it imposed liability on Carter for fraud on the Mohammeds, and render judgment on the jury verdict.

On the issue of whether Carter breached an agreement to send $200,000 to Nazreen, we reverse the judgment to the extent it imposed liability on Carter for breach of the wire transfer document, and render judgment on the jury verdict.

On the issue of Carter's and TIG's liability to Nazreen on the promissory note, we reverse the directed verdict imposing liability on Carter and TIG and remand for jury determination the issues of whether the promissory note is supported by adequate consideration, and if so supported, whether it can be enforced against Carter individually, and TIG.

### C. Costs

We have reversed all portions of the judgment as to Wilson and Carter and remanded for jury determination certain issues regarding the promissory note. Our judgment is in favor of appellants. Under Civil Procedure Rule 139, appellants shall recover the costs of the trial court from appellees. Tex.R. Civ. P. 139. Accordingly, we reverse that portion of the judgment ordering Wilson and Carter, jointly and severally, to pay court costs of $1,071.65 to the Mohammeds, and render judgment Wilson and Carter recover such costs from the Mohammeds, jointly and severally.

## APPENDIX "A"

### U.S. DOLLAR ACCOUNT

PLEASE SENT BY S.W.I.F.T. TRANSFER TO :

Name : Mrs. N. RAMSAHAI - MOHAMMED

Address : 3226 Valcourt Crescent
 Mississauga
 Ontario, L5L 5J2
 Canada

Bank : Scotiabank - The Bank of Nova Scotia

Branch : Ridgeway and The Collegeway, Mississauga, Ontario

Branch # : 93302

Address : 3355 The Collegeway
 Mississauga
 Ontario, L5L 5T3
 Canada

U.S. S Account # : 933020029785

*Payment Amount : $200,000.00*

*We agree to transmit The above amount.*

*Jerome Carter Sr*

*Billy E Wilson*

245

## APPENDIX "B"

### PROMSSORY NOTE

$ 193, 000.00 Houston, Texas May 16, 1997

FOR VALUE RECEIVED, I, WE OR EITHER OF US PROMISE TO PAY TO THE ORDER OF

__Nazreen Mohammed (Royko &
Associates)__

or at such other place as the holder may designate in writing.

THE PRINCIPAL SUM OF ___ONE HUNDRED NINETY-THREE THOUSAND___ DOLLARS

($193,000.00), with interest from ___May 16, 1997___ at the rate o f ___eight and a half___ per centum

(8.5) per annum, lawful money of the United States of America as follows: Due in full on July 25, 1997.

_Jerome Carter, Sr._

__11638 KARLWOOD__

__Houston, Texas 77099__

__On behalf of Trust Investment Group S.A.
Lima T.I.G., Inc.__