HOLMAN STREET BAPTIST
CHURCH, Appellant,

v.

Limas JEFFERSON, Appellee.

No. 14–09–00214–CV.

Court of Appeals of Texas,
Houston (14th Dist.).

July 22, 2010.

Rehearing Overruled Aug. 26, 2010.

Richard Earl Griffin, Alan B. Daughtry, Houston, for appellants.

Grant Cook, Reginald E. McKamie, Sr., Robert L. Galloway, Levi James Benton, Houston, for appellees.

Panel consists of Chief Justice HEDGES and Justices ANDERSON and CHRISTOPHER.

## OPINION

ADELE HEDGES, Chief Justice.

Holman Street Baptist Church appeals from a judgment notwithstanding the verdict (JNOV) favoring Limas Jefferson. Jefferson initially sued Holman Street seeking a declaratory judgment that because the statute of limitations had run on a promissory note signed by Jefferson, Jefferson was entitled to the return of stock given to Holman Street as collateral. Holman Street then filed a counterclaim seeking to collect on the note. At the conclusion of trial, the jury returned findings favorable to Holman Street.

In his motion for JNOV, Jefferson alleged that there was no evidence of his having received consideration in exchange for signing the promissory note. He also argued that as a matter of law, the statute of limitations barred Holman Street's attempt to collect on the note. The trial court granted the motion and ordered the collateral returned to Jefferson. On appeal, Holman Street contends that (1) the evidence was legally sufficient to establish that Jefferson received consideration for signing the promissory note; (2) because Jefferson had sought affirmative relief in his lawsuit, Holman Street could raise its claims despite the running of the statute of limitations; (3) the statute of limitations was extended by Jefferson's promises to repay the loan; and (4) Jefferson was not entitled to return of the collateral. We reverse and remand for further proceedings in accordance with this opinion.

## I. Background

Certain key facts in this case are undisputed, including that (1) in 1992, Jefferson signed a promissory note agreeing to pay Holman Street $93,674.72 plus interest; (2) also in 1992, Jefferson signed a security agreement granting Holman Street a security interest in 142,906 shares of stock in Unity National Bank; (3) Holman Street took possession of the stock on the day the security agreement was signed; (4) Jefferson has made no payments of principal or interest; and (5) the accrued principal and interest was $1,252,837.37 as of June 16, 2008. In the late 1980s, Jefferson and Reverend Manson Johnson, pastor of Holman Street Baptist Church, were on the board of directors of Unity National Bank, which was owned at the time by a bank holding company called Bay Bancshares. In 1989, Bay Bancshares agreed to sell Unity to a group of investors that included Jefferson, Holman Street, and St. Agnes Baptist Church.[1] The purchase price was $1.1 million, with $450,000 paid initially and $650,000 financed with Bay Bancshares.

According to Johnson, in 1989, when the investor group began having trouble making payments on the financed portion of the purchase price, an agreement was reached for a cash settlement. Johnson explained that Jefferson subsequently had difficulty coming up with his $82,600 share of the $200,000 settlement amount. On October 23, 1989, attorneys representing Unity Bank sent a letter to the Federal Reserve Bank of Dallas, in which they stated that: "The viability of the settlement is in jeopardy due to the illiquidity of one of the investors and his consequent inability to pay his $82,600 cash share of the settlement amount." The letter further explained that:

> To avoid the failure of the settlement and the likelihood of ensuing litigation, the current owners and Mr. Johnson,

---

1. Both Jefferson and Johnson explained the churches' involvement in the purchase of the bank as driven by a desire to have a minority-owned bank in Houston's Third Ward community.

pastor of Holman, and Mr. Moore, pastor of St. Agnes, have tentatively agreed to the following arrangement:

1. Mr. Moore and Mr. Johnson will each lend Mr. Jefferson $41,300, which will allow Mr. Jefferson to fund his $82,600 share of the settlement.

2. Each $41,300 promissory note will be non-recourse to Mr. Jefferson and bear interest at 10% per annum. A single payment of principal and interest will be due one year from the date the note is funded....

3. Each $41,300 note will be secured by the pledge of 71,453[2] of Mr. Jefferson's shares of Unity....

Johnson testified that Jefferson agreed to the letter and the loan. Drafts of a promissory note and security agreement were produced showing that Jefferson received copies of them. According to Johnson, when St. Agnes was unable to fund its portion of the loan, Holman Street ultimately loaned the entire amount to Jefferson. Johnson authorized Holman Street's money to be transferred into Jefferson's account "[b]y check or some manner," and he testified that Jefferson never denied receiving the money from Holman Street.

While acknowledging that he met with Holman Street officials in 1992 regarding money paid by the church on his behalf, Jefferson denied having acknowledged any personal loan obligation. Meeting minutes were produced from the business records of Holman Street demonstrating that a meeting occurred on March 15, 1992 between Jefferson, Johnson, and several deacons, or "Administrators," in charge of Holman Street's financial affairs. When

pressed to repay the loan, Jefferson stated that he would see if he could generate the necessary funds from his other business assets.

After that meeting, Holman Street received a signed promissory note and, a few days later, a signed security agreement. Under the terms of the promissory note, signed by Jefferson in his individual capacity, Jefferson agreed to pay, "For Value Received," $93,674.72, plus 5% interest per annum.[3] Such sum was due on demand, or if no demand was made, "then on or before December 31, 1992." The promissory note further explained that "THIS NOTE is entitled to the benefits and security afforded by that certain Security Agreement ... covering the following described collateral: [142,906] shares of common stock of Unity National Bank."

Under the terms of the Security Agreement, "for a valuable and sufficient consideration, the receipt of which [was thereby] acknowledged," Jefferson "assign[ed], transfer[red], convey[ed], and deliver[ed]" to Holman Street 142,906 shares of stock in Unity National Bank and granted Holman Street a security interest therein. The security interest was specifically granted to secure the obligations contained in the promissory note and "any and all renewals, extensions, rearrangements or modifications" thereof. The Security Agreement further provides that in the event of a default, and any time thereafter, Holman Street shall have all the rights and remedies of a secured party under the uniform Commercial Code "or other applicable law" or agreement, including "the right and power to sell ... or otherwise

2. The last three digit of the typewritten number "71,451" are crossed out in the letter, and "453" are handwritten in their place.

3. Holman Street maintains that the promissory note included both the amount Holman Street loaned Jefferson on its own behalf, the amount it loaned him because St. Agnes was not able to produce the amount it was supposed to loan him, and interest on those amounts up to the time the promissory note was signed.

dispose of or utilize the Collateral." Additionally, "[w]hen all of the indebtedness shall have been paid in full and [Holman Street] is not obligated to make additional advances," Holman Street was required to reassign all of its rights in the collateral back to Jefferson. "No delay or omission" by Holman Street in exercising any rights granted under the agreement were to operate as a waiver of any right under the agreement. Lastly, the security interest and all other terms of the agreement were to continue in full force "until first to occur of the following: (i) the expiration of four (4) years from the date of payment of Debtor's last Obligation to Secured Party; or (ii) the payment by Debtor of all obligations secured" by the agreement.

In a letter dated March 16, 1993, Jefferson acknowledged having signed the note "as a personal favor" to Johnson. He also expressed concern about Holman Street's apparent desire to sell its interest in Unity Bank, including the promissory note, to an investor group. He further stated: "This letter is to convey my continued interest and commitment to meet the obligations of the note . . . ."

Johnson testified that beginning after the maturity date of the note, December 31, 1992, but sometime before December 31, 1996 (the cut-off date for the statute of limitations), Jefferson made an at-least annual request for another year to pay the note. When Johnson saw Jefferson each year at the annual shareholders meeting: Johnson asked about the debt, Jefferson agreed to repay it but said he needed another year, and Johnson agreed to extend the note for another year.

In 2004, Roosevelt Weeks, Holman Street Board Chairman, wrote a letter to Jefferson requesting payment of the amount then due on the note, calculated at $497,865.27. In the letter, Weeks noted that Jefferson had "enjoyed the financial benefit" of having the stock in his name, since Jefferson had received over $1 million in dividend payments from Unity Bank. At a meeting with Weeks, Jefferson acknowledged the debt but claimed to need more time to pay it. Later, Johnson showed Weeks an email from Jefferson in which Jefferson complained about the note. When Weeks asked Jefferson directly about the complaint, Jefferson questioned only the calculation of interest.

In 2006, Jefferson filed the present lawsuit against Holman Street, seeking a declaratory judgment that any action on the promissory note or the security agreement was barred by the applicable statutes of limitations and seeking return of the collateralized stock. In his original petition, Jefferson also sought attorney's fees. Holman Street filed a counterclaim to recover on the debt, alleging, among other things, that (1) because Jefferson sought affirmative relief in his lawsuit, the statute of limitations did not bar Holman Street's claims based on the same transaction or occurrence, and (2) Jefferson had entered into a series of oral contracts that extended the debt and the start date for calculating limitations. In response, Jefferson reasserted the statute of limitations and argued that he had not received consideration for signing the promissory note and the security agreement. He further contended that Holman Street's security interest in the stock had expired by its own terms, and he requested a temporary injunction requiring that the stock certificates be placed in the court's registry. The trial court entered an "Agreed Order" in compliance with that request. Although several of his amended petitions included claims for exemplary damages, Jefferson ultimately dropped his exemplary damages claims from later amended petitions and specifically nonsuited his request for attorney's fees before trial.

At the conclusion of the trial, the jury found that Jefferson had received money as consideration for signing the promissory note and the security agreement. It further found that he entered into an oral contract with Holman Street in which he acknowledged the debt and agreed to pay it by December 31, 1996. Lastly, the jury found that Jefferson entered into an oral contract acknowledging the debt and agreeing to pay the past due amount at least once every four years, from the date of the first oral contract through December 31, 2004.

Jefferson then moved for JNOV, arguing that (1) there was no evidence that he had received consideration; (2) Holman Street's claims on the promissory note and security agreement were barred by the applicable statutes of limitations; (3) the filing of the declaratory judgment action did not revive Holman Street's stale claims; (4) by its own terms, the security agreement was no longer effective; and (5) Holman Street could not recover on the basis of alleged oral contract extensions. The trial court initially granted the motion without specifying the underlying basis. In an amended final judgment, however, the court specifically explained that it granted JNOV based on its determinations that (1) Holman Street's claims were barred by the applicable statutes of limitations; and (2) the claims were not revived by the filing of the declaratory judgment. The court further ordered that the stock certificates held in the registry of the court be delivered to Jefferson.

## II. Claims Revival

■ We begin by addressing Holman Street's second issue, in which it contends that the trial court erred in granting a JNOV on statute of limitations grounds because section 16.069(a) of the Texas Civil Practice and Remedies Code authorized Holman Street's claims for collection of the debt despite the running of the statute of limitations. Tex. Civ. Prac. & Rem.Code § 16.069(a). That section provides as follows:

> If a counterclaim or cross claim arises out of the same transaction or occurrence that is the basis of an action, a party to the action may file the counterclaim or cross claim even though as a separate action it would be barred by limitation on the date the party's answer is required.

*Id.* Section 16.069(a) is intended to prevent a party from waiting until an opponent's valid claim, arising out of the same transaction or occurrence, is time-barred before asserting its own claim. *Wells v. Dotson*, 261 S.W.3d 275, 281 (Tex.App.Tyler 2008, no pet.) (citing *Hobbs Trailers v. J.T. Arnett Grain Co., Inc.*, 560 S.W.2d 85, 88–89 (Tex.1977) (discussing substantially similar prior law, Texas Revised Civil Statutes art. 5539c)).

Courts have interpreted section 16.069 as permitting a party's otherwise time-barred counterclaims or cross claims only when the opposing party has sought "affirmative relief," rather than just a declaration on a dispute between the parties. *See, e.g., CDB Software, Inc. v. Kroll* 992 S.W.2d 31, 36 (Tex.App.-Houston [1st Dist.] 1998, pet. denied); *ECC Parkway Joint Venture v. Baldwin*, 765 S.W.2d 504, 513–14 (Tex.App.Dallas 1989, writ denied); *see also Lyles v. Johnson*, 585 S.W.2d 778, 783 (Tex.App.-Houston [1st Dist.] 1979, writ ref'd n.r.e.) (applying article 5539c). For example, if a plaintiff files an action seeking only a declaration that the defendant would be barred by a statute of limitations if it chose to bring a particular cause of action, the defendant could not use section 16.069 to then bring the otherwise time-barred cause of action. *See Ball v. SBC Commc'ns, Inc.*, No. 04–02–00702–

CV, 2003 WL 21467219, at * 4 (Tex.App.-San Antonio June 25, 2003, pet., denied) (not designated for publication). Hence, in the present case, Jefferson's mere seeking of a declaration on limitations regarding his purported debt to Holman Street did not trigger section 16.069(a). However, the question remains whether, in addition to the declaration on limitations, Jefferson also sought affirmative relief.

■ Holman Street contends that Jefferson requested affirmative relief in that he sought attorney's fees and exemplary damages in various pleadings and requested the return of his collateralized stock. We do not opine on whether affirmative claims that were abandoned before or during trial fulfill the requirements of Sec. 16.069(a). We hold that the request for return of the stock was a request for affirmative relief triggering section 16.069(a).

Jefferson's potential recovery is "affirmative" in that the stock would have to be handed over to Jefferson in the event he was successful. *See* Black's Law Dictionary 23 (2d Pocket ed. 2001). It constitutes "relief" because it is a redress or benefit asked of a court. *See id.* at 596. Not only does the requested relief meet the qualifications of section 16.069, philosophically, it fulfills the purpose of that section: preventing a party's waiting until an adversary's cause of action is time-barred before pursuing its own relief on the same transaction or occurrence. *See Hobbs Trailers*, 560 S.W.2d at 88–89; *Wells*, 261 S.W.3d at 281. In requesting return of the stock based on limitations, Jefferson is using the statute of limitations offensively in an attempt to obtain affirmative relief, rather than defensively to defeat Holman Street's recovery on the promissory note.

■ We disagree with Jefferson's contention that he is not seeking affirmative relief because return of the collateral is just a natural consequence of the running of the statute of limitations. As explained in *Miller, Hiersche, Martens & Hayward, P.C. v. Bent Tree National Bank*, when a lender holds personal property as collateral to guarantee a debt, the running of the statute of limitations on an action to collect personally from the debtor does not bar the right of the lender to use the collateral to repay the debt. 894 S.W.2d 828, 829–30 (Tex.App.-Dallas 1995, no writ).[4] The stat-

---

**4.** Jefferson attempts to distinguish *Miller, Hiersche* by pointing out that it involved an attempt to collect the debt by using collateral pledged by a guarantor rather than the debtor. A careful review of both *Miller, Hiersche* and the cases it cites, however, reveals that this distinction was not a meaningful one in terms of the rule espoused in the case. When the court in *Miller, Hiersche* speaks of the statute of limitations as being a "personal privilege," it means that it protects the debtor from an action against his or her person to recover on the debt; it does not mean that only the debtor, and not a guarantor, can assert limitations to prevent the lender from using collateral it holds to collect the debt. 894 S.W.2d at 829; *see also Goldfrank, Frank & Co. v. Young*, 64 Tex. 432, 436–39 (1885) (holding lender was entitled to use collateralized property to collect debt even though property was put forth by debtor and not

guarantor). Except for the fact that the property was pledged by a guarantor, the salient facts of *Miller, Hiersche* on this issue are nearly identical to those in the present case.

Jefferson also cites a number of cases in which courts held that liens on real property were effectively extinguished by the running of the statute of limitations on the underlying debt. *See, e.g., Holford v. Patterson*, 113 Tex. 410, 257 S.W. 213 (1923) (mortgage lien); *Hubble v. Lone Star Contracting Corp.*, 883 S.W.2d 379 (Tex.App.-Fort Worth 1994, writ denied) (mechanic's and materialman's lien); *Neely v. Herman*, No. 6:04cv172, 2005 WL 5015557 (E.D.Tex.2005) (equitable lien). The present case does not involve a lien against real property; it involves personal property physically held by the lender as collateral under a security agreement. Consequently, the real property lien cases cited by Jefferson

ute of limitations provides a personal defense that protects the debtor from an action to collect on the debt after the designated passage of time, but it does not defeat the right of the lender to utilize the collateral already held. *Id.; see also Goldfrank, Frank & Co. v. Young,* 64 Tex. 432, 436–39 (1885) (explaining that while the running of the statute of limitations defeats a lender's judicial remedy, it does not defeat the lender's right to use the security to collect the debt). Consequently, Jefferson's suit seeking to recover his collateralized stock requested affirmative relief in the loan transaction between him and Holman Street; thus, pursuant to section 16.069, Holman Street's action for recovery of the debt was revived. The trial court erred in granting JNOV favoring Jefferson based on statute of limitations grounds. Accordingly, we sustain Holman Street's second issue.

### III. Other Grounds for Vitiating the Verdict

In his motion for JNOV, Jefferson argued in addition to his statute of limitations grounds that (1) there was no evidence that he received consideration, and (2) by its own terms the security agreement was no longer effective. As explained above, the trial court did not grant the JNOV on either of these additional grounds. The court gave specific reasons for its holding in its amended judgment, and those reasons did not include a lack of consideration or expiration of the security agreement by its own terms. When a trial court specifies the ground or grounds upon which it grants a JNOV, an appellant need only challenge those grounds actually relied upon by the trial court. *Edascio, L.L.C. v. NextiraOne L.L.C.,* 264 S.W.3d 786, 795 (Tex.App.-Houston [1st Dist.] 2008, pet. denied); *Swink v. Alesi,* 999 S.W.2d 107, 111–12 (Tex.App.-Houston [14th Dist.] 1999, no pet.).[5]

But when a trial court grants a JNOV, the *appellee* may bring forward by cross-point any additional issue "that would have vitiated the verdict or that would have prevented an affirmance of the judgment if the trial court had rendered judgment on the verdict." Tex.R.App. P. 38.2(b); *see also* Tex.R. Civ. P. 324(c); *Edascio,* 264 S.W.3d at 795. Although Jefferson did not explicitly term his consideration or expiration arguments as "cross-points," he did make such arguments in response to Holman Street's issues. We will therefore consider these arguments as cross-points and assess the merits of Jefferson's contentions.

### A. Consideration

In the first cross-point, Jefferson contends that there was no evidence supporting the jury's determination that he received consideration for signing the promissory note. *See Tanner v. Nationwide Mut. Fire Ins. Co.,* 289 S.W.3d 828, 830 (Tex.2009). In reviewing a no-evidence issue, we must "credit evidence favoring the jury verdict if reasonable jurors could, and disregard contrary evidence unless reasonable jurors could not." *Cent.*

---

are readily distinguishable. Jefferson further cites *McBryde v. Curry* for the proposition that "when a debt is barred by the statute of limitations, an action to foreclose on the security for the debt is also barred." 914 S.W.2d 616, 619 (Tex.App.Texarkana 1996, writ denied). *McBryde* is distinguishable because it is not a case where the lender held collateral; instead, it involved the lender's attempt to

collect life insurance proceeds after the right to action on the debt had expired under the statute of limitations. *Id.* at 618.

5. Consequently, Holman Street's first issue asserting that the trial court erred in granting JNOV based on a lack of consideration is moot.

*Ready Mix Concrete Co. v. Islas,* 228 S.W.3d 649, 651 (Tex.2007). The final test is "whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review." *City of Keller v. Wilson,* 168 S.W.3d 802, 827 (Tex.2005).

When there is no consideration from one party to another, the contract lacks mutuality, is unilateral, and unenforceable. *Wilson & Wilson Tax Servs., Inc. v. Mohammed,* 131 S.W.3d 231, 242 (Tex.App.-Houston [14th Dist.] 2004, no pet.). As long as something of real and legally cognizable value is given in exchange for a promise to pay under a promissory note, the note is supported by adequate consideration. *Suttles v. Thomas Bearden Co.,* 152 S.W.3d 607, 614, (Tex. App.-Houston [1st Dist.] 2004, no pet.). A promissory note is issued for value when it is issued as payment of, or as security for, an antecedent debt. Tex. Bus. & Com. Code § 3.303(a)(3); *Suttles,* 152 S.W.3d at 614.[6] In three pages of his brief, Jefferson argues that the Church failed to establish that he received consideration for signing the promissory note or the security agreement because (1) no one testified to having personally given money to Jefferson or his company; (2) Holman Street had no documentary evidence establishing that consideration was given; (3) contrary evidence established that it was Jefferson's company, Jefferson Associates, that actually loaned him the money, not Holman Street; and (4) in the absence of alter ego evidence, Johnson's testimony that a check was issued to Jefferson Associates for Jefferson's benefit does not establish that Jefferson received the money.

When Jefferson signed the promissory note, he represented that he was promising to pay the indicated sum "For Value Received." Furthermore, in signing the security agreement, Jefferson represented that the given security was in exchange "for a valuable and sufficient consideration, the receipt of which [was thereby] acknowledged." Thus, the promissory note and the security agreement themselves constituted evidence that consideration was given in exchange for signing these documents. *See Wilson & Wilson,* 131 S.W.3d at 242 (holding that promissory note itself constituted evidence that consideration was given wherein it stated that it was entered "For Value Received"). Additionally, both documents indicate that Jefferson signed them in his individual capacity, refuting Jefferson's contention that it was his company and not he himself that was involved in the transaction with Holman Street.

Moreover, Johnson testified that Holman Street loaned Jefferson the money because he needed it to fund the settlement with Bay Bancshares for the purchase of Unity Bank. Johnson also testified that Jefferson confirmed the debt and agreed to pay it on numerous occasions. This testimony concerning the loan was corroborated by the letter proposal sent to federal authorities, the Holman Street meeting minutes concerning a meeting between Jefferson and deacons of the church, subsequent letters between Jefferson and Johnson, a letter from Roosevelt Weeks to Jefferson, and Weeks' testimony.

That no one testified to physically handing money to Jefferson is of no moment given the substantial evidence that he was loaned the money and acknowledged the debt. Further, the possibility that the money may have passed through his busi-

---

6. *Suttles* is the only authority Jefferson cites in the portion of his brief discussing consideration.

ness, Jefferson Associates, does not negate the evidence that the money was loaned for Jefferson's use as an individual to fund his share of the Unity settlement. The jury was entitled to believe Johnson's and Weeks' testimony, as well as the statements in the promissory note and the security agreement, that money was loaned by Holman Street to Jefferson. *See Wilson*, 168 S.W.3d at 827. Accordingly, we overrule Jefferson's cross-point concerning consideration.

## B. Expiration of Security Agreement

In his second cross-point, Jefferson argues that prior to the instigation of this lawsuit, the security agreement had expired under its own terms. He references the following language contained in the agreement:

> The security interest hereby granted and all the terms and provisions hereof shall be deemed a continuing security agreement and shall continue in full force and effect, and all the terms and provisions hereof shall remain effective as between the parties, until first to occur of the following: (i) the expiration of four (4) years from the date of payment of Debtor's last Obligation to Secured Party; or (ii) the payment by Debtor of all obligations secured hereby and the giving by Debtor of ten (10) days written notice of revocation of the terms and provisions hereof.

In construing a contract, our primary concern is to ascertain the parties' intent as expressed in the instrument. *Seagull Energy E & P, Inc. v. Eland Energy, Inc.,*

207 S.W.3d 342, 345 (Tex.2006). To ascertain those intentions, we examine the entire contract in an effort to harmonize and give effect to all of its provisions so that none will be rendered meaningless. *Id.* No single provision should be given controlling effect, but all provisions must be construed in reference to the whole. *Id.* When a written contract is so worded that it can be given a certain or definite legal meaning or interpretation, it is not ambiguous, and the court construes it as a matter of law. *Am. Mfrs. Mut. Ins. Co. v. Schaefer*, 124 S.W.3d 154, 157 (Tex.2003).

Jefferson specifically asserts that because "the date of the last payment obligation under the Promissory Note w as December 31, 1992," the security agreement expired by its own terms on December 31, 1996. Jefferson's argument misreads the language of the security agreement, which states that it remains effective until payment of Jefferson's last obligation thereunder or all of his obligations thereunder.[7] Jefferson has acknowledged that he made no payments on his obligations to Holman Street. Having made no payments, Jefferson cannot be said to have paid his last obligation, or all of his obligations, to Holman Street. Furthermore, an earlier section of the agreement refutes Jefferson's reading of this section, wherein it states that "[n]o delay or omission" by Holman Street in exercising any rights granted under the agreement would operate as a waiver of any right under the agreement. Thus, the security agreement has not expired by its own terms, and Jefferson's cross-point is without merit.[8]

---

7. The security agreement allowed for multiple loans to be secured by the same collateral, although there is no indication that it actually secured more than one loan.

8. In the trial court, Jefferson argued that the running of the statute of limitations extinguished his debt under the promissory note

and related security agreement. This is clearly not so under Texas law. *See, e.g., Miller, Hiersche*, 894 S.W.2d at 830 ("Texas has consistently followed the legal principle that the statute of limitations may bar an action to recover on a debt, but the debt still exists and the holder of collateral may use the collateral

## IV. Disposition

We sustain Holman Street's second issue and hold that the trial court erred in granting a JNOV on statute of limitations grounds. We overrule Jefferson's presumed cross-points stating additional grounds on which he asserts that JNOV should have been granted. Because of our resolution of these issues, we sustain Holman Street's fourth issue in which it contended that the trial court erred in ordering the collateralized stock released to Jefferson because limitations barred any action on the underlying debt. We need not address Holman Street's remaining appellate issues. We reverse the trial court's judgment, reinstate the jury's verdict, and remand for entry of judgment in keeping with that verdict.

to repay the debt according to the terms of the collateral agreement.'').