

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

No. 06-15-00045-CV

_____

DUDLEY CONSTRUCTION, LTD., RICHARD MARK DUDLEY,
AND HARTFORD FIRE INSURANCE COMPANY, Appellants

V.

ACT PIPE & SUPPLY, INC., Appellee

On Appeal from the 361st District Court
Brazos County, Texas
Trial Court No. 12-000281-CV-361

Before Morriss, C.J., Moseley and Burgess, JJ.
Opinion by Chief Justice Morriss
Dissenting Opinion by Justice Burgess

# O P I N I O N

In its role as supplier to Dudley Construction, Ltd., and Richard Mark Dudley (collectively, Dudley[1]), ACT Pipe & Supply, Inc., (ACT) helped Dudley on two water and sewer improvement projects in Texas' Bryan/College Station area.[2] After engaging in some give and take over the type of pipe fittings that were to be supplied, the parties ended up disputing the cost of materials provided. ACT sued Dudley and Hartford Fire Insurance Company, the payment-bond surety on the projects. After trial yielded jury findings generally favorable to Dudley, the trial court entered judgment notwithstanding the verdict (JNOV), awarding ACT a judgment for $124,483.90 in damages and $131,823.99 in attorney fees.

On appeal, Dudley argues that the trial court erred by granting a JNOV on ACT's sworn-account and trust-fund claims on the Tabor Road Project (the Tabor Project), by awarding attorney fees to ACT, by failing to require ACT to segregate its attorney fees, by basing its award against Dudley and Hartford on ACT's payment-bond claim, by failing to file requested findings of fact and conclusions of law, and by directing a verdict and refusing to submit a jury question on Dudley's fraud counterclaim. Dudley also asserts that the evidence is legally and factually insufficient to support either the jury's answers that ACT perfected its bond claim or the amount of attorney fees awarded. We affirm in part and reverse in part.[3]

---

[1]Since no issue in this appeal turns on the separate identities of Richard Dudley and his company, for the purpose of simplicity this opinion refers to them together.

[2]Originally appealed to the Tenth Court of Appeals in Waco, this case was transferred to this Court by the Texas Supreme Court pursuant to its docket equalization efforts. *See* TEX. GOV'T CODE ANN. § 73.001 (West 2013). We follow the precedent of the Tenth Court of Appeals in deciding this case. *See* TEX. R. APP. P. 41.3.

[3]See *infra* Part G.

Before we address the particular arguments, we offer this extensive background explanation of the factual and legal posture of this case.

Dudley was the winning bidder on two water and sewer improvement projects in Texas' Bryan/College Station area. One project was in Bryan and is referred to as the Tabor Project, while the other project was in College Station and is referred to as the Reclaimed Water Project. The issues in this case arise primarily from the Tabor Project.[4]

The purpose of the Tabor Project was to add a five-million-gallon storage tank and to clean, line, and beautify an existing tank. Dudley was the general contractor on the job, and ACT provided pipe and pipe fittings for the connections under the tank and for hooking the tank into the main distribution system. The dispute in this case centered on the nature of the pipe required by the plan specifications and the prices to be paid for that pipe. To understand the parties' dispute, it is helpful to understand the pipe technology used in the Tabor Project.

## A.    The Pipe Technology

Two general types of pipe technology were referenced in this case, slip-joint, also called push-joint pipe, and restrained-joint pipe. The slip-joint pipe referred to in this case is straight on one end and flares into a bell on the other end. A straight pipeline of slip-joint pipe is created by inserting the straight end of one section of pipe into the bell end of the adjacent section of pipe and repeating the process with other sections until the pipeline reaches the desired length. The pipeline is then attached to the beginning and ending destinations through fittings.[5] By contrast, restrained-

---

[4]Unless otherwise noted, all references to the project, the plans, and the specifications refer to the Tabor Project.

[5]Fittings include 90-degree, L-shaped fittings, T-shaped fittings, gate valves, and 45-degree valves. Throughout the course of the pipeline, there were various fittings between joints where the pipeline changed directions.

joint pipe does not simply join together, it also has mechanisms that lock adjacent sections together where joined.[6]

When fluids are pushed through a pipeline under pressure, the internal pressure from that fluid causes the pipe sections to separate at the joints. Therefore, pressurized pipelines must be restrained in some manner to keep the pipe sections from moving and separating. Restrained-joint pipe is, by definition, restrained. Additional restraints may be added, but the pipe itself is restrained when assembled. Slip-joint pipe can be restrained in at least three ways. First, it can be restrained through internal restraint inserts. Second, it can be externally restrained by adding locking mechanisms to the outside of the joined pipe joints. Finally, slip-joint pipe can be externally restrained by concrete blocking.

Concrete blocking is accomplished by pouring concrete between the pipe fittings and the stable ground beneath the fittings. The pipe joints are then anchored to the concrete at the point where fittings are placed using metal harnesses or clamps around the pipe which are secured to the concrete. These anchors serve to keep the pipe from moving and separating when the internal pressure inside the pipeline increases as fluid begins moving through it.

### B. ACT's Original Proposal and Submittals

When the City announced it was accepting bids for the Tabor and Reclaimed Water Projects, ACT's Waco operations manager, Mark Stroud, provided a proposal to Dudley called a

---

[6]One type of restrained-joint pipe is similar in appearance to slip-joint pipe, but internal or external locking mechanisms are manufactured on the pipe so that, when the straight end of one pipe section is inserted into the bell end of an adjacent pipe section, the pipe locks together. Another type of restrained pipe is flanged pipe, which is straight on both ends with a flange attached to each end. A straight pipeline or traditional external restrained pipe is created by placing the flanges of adjacent pipe joints side by side and bolting them together. The issues in this litigation did not involve flanged pipe.

4

"takeoff."[7] Stroud believed that slip-joint pipe met the engineer's specifications and, therefore, the contract's specifications, because the plans called for concrete blocking. Accordingly, Stroud used prices for slip-joint pipe in preparing the first submittal.[8] In the takeoff, Stroud estimated the cost of the pipe at $95.00 per unit of 36-inch pipe and $74.53 per unit of 30-inch pipe. When Dudley was awarded the contract by the City, Stroud ordered the slip-joint pipe from the pipe manufacturer, McWane, to lock-in the quoted price and to make sure that the pipe was shipped timely.[9]

However, after Stroud placed the order with McWane, the City rejected ACT's subsequent submittal for slip-joint pipe and instead indicated that the project called for restrained-joint pipe. After receiving news of the rejection, Stroud created a second submittal to Dudley quoting prices for restrained-joint pipe. This second submittal quoted a price of $109.71 for 36-inch pipe and $82.00 for 30-inch pipe. ACT's second submittal was approved by the City. Nevertheless, Stroud

[7]When a contracting party announces a construction project and makes an invitation for bids by contractors, material suppliers, such as ACT, will obtain the plan specifications and prepare a "takeoff" of materials and prices and submit it to all of the contractors who are bidding on the project. After negotiating with the supplier, the contractors will then use the takeoff in calculating their bid. If the bid is awarded to the contractor who used the supplier's takeoff, the contractor will then obtain a "submittal" from the supplier for approval by the contracting party. The submittal will contain dimensional data, weights, lengths, heights of material, inside and outside diameters, length, and the type of lining inside the pipe. If the submittal is approved by the contracting party, the contractor will begin work and the supplier will order the approved materials.

[8]The plans and specifications on the Tabor Project called for the pipe to be restrained by concrete blocking. Stroud testified that the plans and specifications were subject to a certain amount of interpretation by whoever was reading them, but that ultimately the City of Bryan had the final say. By calling for the pipe to be restrained by concrete blocking, the plans created room for interpretation over whether that meant slip-joint pipe with concrete blocking or restrained-joint pipe with concrete blocking. This room for interpretation accounts for much of the parties' dispute in this case.

[9]Stroud testified that manufacturers do not have large inventories of this type of pipe because it is big, bulky, and expensive. Rather, it must be manufactured for the particular job. To assure that the pipe would be available when it was needed on the project, Stroud had to account for the time needed by McWane to manufacture and deliver the pipe. Therefore, he locked in the order before the submittal was approved.

failed to alter his purchase order with McWane, and McWane continued to manufacture the slip-joint pipe rather than the restrained-joint pipe.

### C.    Slip-Joint Pipe Shipped

Subsequently, Stroud received a call from Dudley's project manager, Michael Ham, informing him that he was ready for the pipe, and Stroud contacted McWane to release the pipe. However, because Stroud had never altered the purchase order to McWane to reflect the change from slip-joint pipe to restrained-joint pipe, McWane shipped the originally ordered slip-joint pipe to the job site rather than restrained-joint pipe that was identified in the second submittal. Approximately one week later, Stroud received an email from Ham stating that the wrong pipe was shipped to the job site. Stroud then began searching for restrained-joint pipe to meet the City's requirements. Stroud told Ham that the restrained-joint pipe would be more expensive than the slip-joint pipe, but Ham responded that Dudley would require ACT to supply the restrained-joint pipe for the original slip-joint pipe price that was submitted.

In an attempt to resolve the dispute over the price to be paid for the restrained-joint pipe, Dudley's owner, Richard, reached out to ACT's regional manager, Curt Murray. Murray informed Dudley of the original problem regarding Stroud's failure to update ACT's purchase order from McWane. The next day, however, Murray emailed Dudley and told him that, after reviewing the project plans and specifications, he believed the originally ordered slip-joint pipe complied with the contract and no updated purchase order was ever needed in the first place. According to Murray, Stroud was mistaken in assuming that Ham and the City were correct when they told him

6

the plans and specifications called for restrained-joint pipe and acting on that assumption without verifying the accuracy of the information.

### D. Use of Slip-Joint Pipe with Modifications

On September 21, 2011, Dudley wrote to the project engineers and the assistant city engineer and informed them of Dudley's position that the Tabor Project documents did not specify the method of restraint to be used. After that correspondence, Dudley met with the City engineer and argued that the originally ordered slip-joint pipe met the project's specifications. At that meeting, Dudley received approval from the City to use the slip-joint pipe with external restraints. At no additional charge, ACT supplied Dudley with the additional restraints, valued at approximately $17,500.00.[10] Accordingly, the original order of slip-joint pipe was used by Dudley in completing the project, as modified by adding the external restraints.

### E. Dispute Over the Prices for Slip-Joint Pipe

The dispute in this case is based on whether Dudley agreed to pay the higher prices of $109.71 per 36-inch unit and $82.00 per 30-inch unit of restrained-joint pipe or the lower prices of $95.00 per 36-inch unit and $74.53 per 30-inch unit of slip-joint pipe. As noted previously, ACT's second submittal quoted the higher prices, but its first submittal quoted the lower prices.[11]

---

[10]Stroud testified that the City contended that the contract called for each pipe joint to be restrained. Dudley contended that the piping should have been restrained through the use of blocking and joint restraints at the fittings. The City and Dudley ultimately agreed to use a combination of concrete blocking and restrained joints at the fittings rather than using restraints at each adjacent pipe joint. According to Stroud, this was the position ACT took initially when it first submitted its takeoff to Dudley to supply slip-joint piping.

[11]When Ham informed Stroud that the City had rejected its first submittal, Stroud presented the second submittal showing $109.71 per 36-inch unit and $82.00 per 30-inch unit of restrained-joint pipe.

7

On September 14, 2011, Dudley signed a purchase order for the slip-joint pipe that was ultimately used on the project. The purchase order used the lower prices rather than the higher prices.

Murray approved the purchase order with the lower prices on behalf of ACT, but he testified at trial that those prices were not consistent with the parties' agreement. Murray testified that, during the construction process, the parties had agreed to use the higher prices on the Tabor Project to offset cost reductions for pipe used in the Reclaimed Water Project. Murray testified that either Ham or Dudley inserted the lower prices in the purchase order knowing that they did not conform to their agreement, but that he overlooked them when he signed the purchase order. Dudley denied any such agreement by Rogers and instead asserted that the lower prices stated in the purchase order were what they had agreed to pay for the slip-joint pipe and, therefore, were the correct figures.

After both projects were completed, Dudley sent ACT's invoices, along with invoices from other subcontractors, to the Cities for payment. The Cities paid Dudley for the full amount of ACT's invoices, which included the Tabor invoice charging the higher prices. Dudley deposited the money in its bank account, but declined to pay ACT for either project. Dudley explained that he refused to pay ACT because their demand exceeded the lower prices secured by the purchase order.

### F.    The Litigation

Because the dispute remained unresolved, ACT filed a suit on sworn account that was verified by Rhonda Wilson, senior credit manager for ACT. ACT's statement of account demonstrated that it shipped materials to Dudley and asserted that Dudley's balance for the

materials was $19,642.82 for the Reclaimed Water Project and $124,071.97 for the Tabor Project. Accordingly, ACT's suit on sworn account was for a total sum of $143,714.79, which Wilson swore was a just and true amount that was due after allowing all just and lawful offsets, payments, and credits.

ACT's petition contained several other causes of action. It sued Hartford and alleged that it was jointly and severally liable as a surety on a payment bond that guaranteed prompt payment to Dudley's subcontractors for the Reclaimed Water and Tabor Projects. Because both Cities had already paid Dudley for the projects in full, ACT sued for violations of the Texas Prompt Payment Act (TPPA). ACT also included a trust-fund claim, causes of action for fraud and breach of fiduciary duty, and a prayer for attorney fees under Chapter 38 of the Texas Civil Practice and Remedies Code and Chapter 2253 of the Texas Government Code. Dudley's answer, which included a verified denial of the sworn-account claim, argued that ACT's failure to deliver the approved restrained-joint pipe caused delays and incidental and consequential damages. Dudley counterclaimed for breach of contract and fraud.[12]

After the jury was presented with the evidence at trial, it answered a sixteen-question charge and, in the process, displayed some apparent confusion. We discuss the jury charge in detail.

In question one, the jury found that ACT delivered labor, materials, or equipment to Dudley for the Reclaimed Water and Tabor Projects. In question two, the jury found that the prices

---

[12]Dudley and Construction also filed amended counterclaims for negligence and negligent misrepresentation. These counterclaims were struck by the trial court for failure to timely serve ACT.

9

charged by ACT were "in accordance with the agreement" between ACT and Dudley for the Reclaimed Water project, but not for the Tabor Project. Question two did not specify or further instruct the jury on the meaning of the term "agreement." The jury instructions required the jury not to answer question three if it had answered that the prices charged by ACT were not in accordance with "the agreement." The jury disregarded this instruction and answered that the amount owed to ACT remained unpaid for both projects. Although the jury was instructed not to answer the next question for the Tabor Project in light of their answer to question two, the jury found that ACT was entitled to reasonable compensation of $14,214.20 for the Reclaimed Water project and $110,629.70 for the Tabor Project.

In its answer to question five, the jury found that Dudley did not fail to comply with the obligations to ACT under the TPPA for any of the projects because a good faith dispute existed concerning the amount owed. In questions six and seven, the jury found that ACT perfected its bond claim against Dudley and Hartford for both projects in an amount of $14,214.20 for the Reclaimed Water project and $110,629.70 for the Tabor Project. In questions eight through twelve, the jury found that Dudley was the trustee of funds received from the Cities, ACT was a beneficiary of the trust funds, and Dudley misapplied the trust funds. Yet, in question thirteen, the jury found that no money was required to fairly compensate ACT for the misapplication of trust funds.

In questions fourteen and fifteen, the jury found that ACT failed to comply with an agreement with Dudley but that ACT's failure to comply with the agreement was excused. The

10

jury abided by the trial court's instruction not to answer question sixteen if it found ACT's failure to perform was excused.

In a motion for JNOV, ACT took issue with the jury's finding that the prices charged for the Tabor Project were not in accordance with its agreement. It asked the trial court to alter the jury's finding on question two because, in answering question four, the jury found that ACT was entitled to $110,629.70, an amount allegedly supported by the purchase agreement. Thus, ACT argued that the prices it charged were supported by an agreement. It asked the trial court to enter judgment in its favor on its sworn-account claims and to award damages in the amount specified by the jury in question four. In response, Dudley agreed that the trial court should enter judgment on the Reclaimed Water project for ACT on the suit on sworn account in the amount of $14,214.20. However, Dudley argued that the jury's finding could not support ACT's sworn-account claim because the higher prices sought by ACT in its invoices and in the sworn-account claim were not supported by the purchase order.

ACT also asked the trial court to disregard the jury's finding that no money was required to compensate ACT for the misapplication of funds. Relying on the jury's answer to questions four and seven, ACT argued that there was no evidence to support the jury's zero dollar award. It asked the trial court to substitute the jury's damage answers from these questions as the answer to question thirteen and asked the court to find that $124,843.90 would compensate ACT for the misapplication of trust funds. Dudley argued against the JNOV on question thirteen on the basis that the jury could have decided no damages were necessary since it found that there was a dispute over the funds and decided the dispute in its favor.

11

Additionally, ACT asked the trial court to enter judgment in accordance with the jury's verdict on the bond claim and to award attorney fees in the amount of $131,823.99. To support the amount of attorney fees sought, ACT attached the affidavit of its counsel which stated the hourly rate and time devoted to the case. The affidavit included detailed invoices and billing records as attachments.

Dudley argued against entry of judgment on the perfection of bond claim. Dudley contended that Hartford's joint and several liability was predicated on ACT having a successful cause of action. Dudley argued that the jury's verdict on the suit on sworn account claim for the Tabor Project was in its favor, not ACT's. In arguing against the award of attorney fees, Dudley's attorney, Robert Swearingen, filed an affidavit claiming that ACT's attorney was seeking an unreasonable fee. Dudley also argued that the jury's findings on some of the issues were favorable to Dudley and that ACT had failed to segregate its fees.

After hearing argument, the trial court granted ACT's motion for JNOV. It entered final judgment finding that the jury should have concluded that the prices charged by ACT were in accordance with the agreement between ACT and Dudley Construction for the Tabor Project. The trial court accepted the jury's damage award in response to question number four in the amount of $14,214.20 for the Reclaimed Water project and $110,629.70 for the Tabor Project. Because the trial court found that damages were uncontroverted and conclusively proven, it substituted those amounts for the jury's zero dollar awards in response to question number thirteen. The trial court also found that attorney fees were uncontroverted and conclusively proven. It entered judgment

12

awarding ACT $124,483.90 in damages against Dudley and holding Hartford jointly and severally liable. The trial court also awarded ACT $131,823.99 in attorney fees.

Dudley filed a motion for new trial arguing that the trial court erred by disregarding the jury's answer to questions two and thirteen because the evidence was legally and factually insufficient to support the trial court's substituted findings or the jury's answer to question four. Dudley argued that the evidence was insufficient to support the jury's finding that the bond claim was perfected or that there was a misapplication of funds, that the bond claim did not entitle ACT to damages, and that the trial court erred in awarding ACT attorney fees.[13] Dudley also claimed that the trial court erred in refusing the amended counterclaims on the ground that Dudley's pleading was untimely delivered to the opposing party and that the jury charge was erroneous because the trial court erred by refusing to submit a question on their claim of fraud. The trial court denied Dudley's motion for new trial.

### G. Our Conclusions and Analysis

This is how we sort all this out. As to that portion of the trial court's judgment that ACT recover on its sworn-account claim on the Tabor Project, we reverse and render judgment that ACT take nothing on that claim. As to ACT's trust-fund and payment-bond claims on the Tabor Project, and as to ACT's claim to recover attorney fees, we reverse those portions of the judgment and remand those claims to the trial court to determine the appropriate amount of recovery, if any, on those claims. As to the portion of the trial court's judgment that ACT recover $14,414.20 on

---

[13]Dudley also argued that ACT failed to make a demand under Chapter 38 of the Texas Civil Practice and Remedies Code.

its sworn-account, trust-fund, and payment-bond claims on the Reclaimed Water project, and as to all other rulings and dispositions made in the trial court's judgment and not referenced in this paragraph, we affirm.

We make the above dispositions because we conclude as follows: (1) sufficient evidence supported the no-recovery jury finding on ACT's sworn-account claim on the Tabor Project; (2) fact issues remain as to ACT's trust-fund claim on the Tabor Project; (3) the payment-bond claim, though perfected, must be remanded on the Tabor Project; (4) attorney fees must be decided on remand; and (5) the other dispositions by the trial court should stand.

*(1)*      *Sufficient Evidence Supported the No-Recovery Jury Finding on ACT's Sworn-Account Claim on the Tabor Project*

"A suit on a sworn account is a suit in which the rules of civil procedure control evidentiary matters." *Double Diamond, Inc. v. Hilco Elec. Co-op., Inc.*, 127 S.W.3d 260, 268 (Tex. App.—Waco 2003, no pet.). "If the sworn denials are filed, as [Dudley] did, the evidentiary effect of the itemized account is destroyed, and the party must prove its claim." *Id.* The essential elements of a suit-on-sworn-account claim are

> (1) the order for the merchandise and its delivery, (2) the justness of the account—that is, that the prices charged were agreed on by the parties, or, in the absence of an agreement, that the prices are usual, customary or reasonable, and (3) the amount that is due and unpaid on the account.

*Brooks v. Eaton Yale & Towne, Inc.*, 474 S.W.2d 321, 323 (Tex. App.—Waco 1971, no writ); *see Ellis v. Reliant Energy Retail Servs., L.L.C.*, 418 S.W.3d 235, 246 (Tex. App.—Houston [14th Dist.] 2013, no pet.).

14

Dudley contends that it was error for the trial court to alter the jury finding that the prices charged for the Tabor Project were not in accordance with the agreement. "The trial court is required to submit questions to a jury which are raised by the written pleadings and the evidence." *Dorton v. Chase*, 262 S.W.3d 396, 398 (Tex. App.—Waco 2008, pet. denied) (citing TEX. R. CIV. P. 278). "To sustain the action of the trial court in granting a motion for judgment notwithstanding the verdict, we must determine that there is no evidence on which the jury could have made the findings relied on." *Id.* (citing *Dowling v. NADW Mktg., Inc.*, 631 S.W.2d 726, 728 (Tex. 1982)). In doing so, we must consider all of the evidence in the light most favorable to the jury's verdict. *Basic Capital Mgmt., Inc. v. Dynex Commercial, Inc.*, 402 S.W.3d 257, 261 (Tex. App.—Dallas 2013, pet. denied); *see Willet v. Cole*, 249 S.W.3d 585, 589 (Tex. App.—Waco 2008, no pet.).

As set forth in its petition, ACT's suit on sworn account alleged that Dudley owed $124,071.97 for the Tabor Project. It relied on the second submittal by Stroud to support the justness of the account and alleged that $124,071.97 was due and owing. Dudley disputed this amount by presenting evidence of the signed purchase order, which raised a fact question as to the justness of the account. The jury resolved that fact question in Dudley's favor.

Because the jury's finding on question two for the Tabor Project was supported by the evidence, the JNOV on that project was error. Accordingly, we sustain this point of error.

*(2)    Fact Issues Remain as to ACT's Trust-Fund Claim on the Tabor Project*

Dudley also argues that the trial court erred in altering the jury's verdict that ACT was not entitled to any damages for the misapplication of trust funds because the evidence supported the jury's finding, or, in the alternative, the trial court erred in determining the amount of damages.

15

In its answer to question thirteen, the jury found that no damages were proximately caused by the misapplication of trust funds.[14] Dudley argues that the jury's answer was supported by legally sufficient evidence "because there was no loss of the construction funds—they were held by Dudley Construction, Ltd. because there was a dispute between the parties due to ACT's overcharges as found by the jury." Dudley cites no authority in support of this argument. "To present an issue for review, a brief must contain appropriate citations to authorities." *Camp Roofing Ltd. v. Park Side Villas I, LLC*, No. 10-10-00417-CV, 2011 WL 5829558, at \*1 (Tex. App.—Waco Nov. 2, 2011, no pet.) (citing TEX. R. APP. P. 38.1(i)). We address only Dudley's argument in the alternative.

---

[14]The language of question thirteen was:

> What sum of money, if any, if paid now in cash, would fairly and reasonably compensate ACT Pipe & Supply, Inc. for its damages, if any, that were proximately caused by such misapplication of trust funds?
>
> "Proximate cause" means a cause that was a substantial factor in bringing about an event, and without which cause such event would not have occurred. In order to be a proximate cause, the act or omission complained of must be such that a person using ordinary care would have foreseen that the event, or some similar event, might reasonably result therefrom. There may be more than one proximate cause of an event. Consider the following elements of damages, if any, and none other.
>
> 1. Amounts owed on the Reclaimed Water Project.
>
> 2. Amounts owed on the Tabor Road Project.
>
> Do not add any amount for interest on damages, if any.
>
> Answer separately in dollars and cents for damages, if any.
>
> Answer
> Reclaimed Water Project   $0.00
> Tabor Road Project         $0.00

"Under the Texas Construction Trust Fund Act, '[c]onstruction payments are trust funds.'" *Ulusal v. Lentz Eng'g, L.C.*, No. 01-15-00597-CV, 2016 WL 1470013, at *6 (Tex. App.—Houston [1st Dist.] Apr. 14, 2016, no pet. h.) (quoting TEX. PROP. CODE ANN. § 162.001(a) (West 2014)). "A trustee who, intentionally or knowingly or with intent to defraud, directly or indirectly retains, uses, disburses, or otherwise diverts trust funds without first fully paying all current or past due obligations incurred by the trustee to the beneficiaries of the trust funds, has misapplied the trust funds." *Id.* (quoting TEX. PROP. CODE ANN. § 162.031(a) (West 2014)). "Proof of current or past due obligations under a construction contract, then, would constitute proof of damages under the Texas Construction Trust Fund Act." *Id.*

ACT argues that the trial court's JNOV on the amount of damages was proper.[15] In order for the trial court to substitute a damage award in place of the jury's finding, the damages must have been conclusively proven. *See City of Keller v. Wilson*, 168 S.W.3d 802, 810 (Tex. 2005). The Texas Construction Trust Funds Act creates a cause of action for failure to make payments under a construction contract. *Id.* The only signed contract between Dudley and ACT was the purchase order showing that Dudley owed $6,840.00 for the 36-inch pipe and $4,052.94 for the 30-inch pipe. ACT argued that the damage award should be based on the purchase order and corresponding bid. From the documentation presented at trial, it is unclear how the jury reached its decision on the other damage questions, although it is clear that the trial court based its actions on the jury's findings to those questions. Simply put, it does not appear that the obligations of

---

[15]ACT argues that the evidence did not support the jury's zero dollar damage award because it was uncontested that ACT had not yet been paid for materials supplied.

17

Dudley under any contract yielded exactly $110,629.70, and ACT has failed to demonstrate how the jury reached these numbers in its briefing. Because damages under the Texas Construction Trust Fund Act were not conclusively established as being $110,629.70, we find that the trial court erred in the amount of damages assessed under question thirteen. We sustain Dudley's second point. While the jury found zero damages, we conclude that it was conclusively proven and not really contested that there was some sum of money, more than nothing, that constituted a trust fund under the statute.[16] For that reason, we conclude that the amount of the trust-fund recovery must be addressed on remand.

*(3)      The Payment-Bond Claim, Though Perfected, Must be Remanded on the Tabor Project*

Dudley and Hartford argue that there was no evidence to support the jury's finding that ACT perfected its bond claim. "In reviewing a verdict for legal sufficiency, we credit evidence that supports the verdict if reasonable jurors could, and disregard contrary evidence unless reasonable jurors could not." *HMC Hotel Props. II Ltd. P'ship v. Keystone-Tex. Prop. Holding Corp.*, 439 S.W.3d 910, 913 (Tex. 2014). Evidence is legally insufficient to support a jury's verdict

> when (1) there is a complete absence of evidence of a vital fact; (2) the court is barred by the rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more

---

[16]No party has mentioned Rule 324(c) of the Texas Rules of Civil Procedure or Rule 38.2(b)(1) of the Texas Rules of Appellate Procedure. The Rules provide that, when a JNOV is appealed and reversed, the appellee's "failure to bring forward by cross-points such grounds as would vitiate the [original jury] verdict shall be deemed a waiver" of such a vitiating argument. TEX. R. CIV. P. 324(c); *see* TEX. R. APP. P. 38.2(b)(1). While ACT has not explicitly set out or named any of its appellate arguments as "cross-points," it has substantively made arguments that would, if accepted, vitiate the original jury verdict of zero damages. In this opinion, we consider such arguments as cross-points and do not consider the arguments waived. *See JJJJ Walker, L.L.C. v. Yolick*, 447 S.W.3d 453, 459 (Tex. App.—Houston [14th Dist.] 2014, pet. denied); *Holman St. Baptist Church v. Jefferson*, 317 S.W.3d 540, 547 (Tex. App.—Houston [14th Dist.] 2010, pet. denied).

18

than a mere scintilla; or (4) the evidence conclusively establishes the opposite of the vital fact.

*Id.*

Chapter 2253 of the Texas Government Code, known as the McGregor Act, "requires general contractors [on public work projects] to secure a bond from a surety, allows a subcontractor to sue the surety for unpaid balances for work and materials, and awards reasonable attorneys' fees." *United Fire & Cas. Co. v. Boring & Tunneling Co. of Am.*, 321 S.W.3d 24, 27 (Tex. App.—Houston [1st Dist.] 2010, pet. denied).

> A payment bond beneficiary who has provided public work labor or material under a public work contract for which a payment bond is furnished . . . may sue the principal or surety, jointly or severally, on the payment bond if the claim is not paid before the 61st day after the date the notice for the claim is mailed.

TEX. GOV'T CODE ANN. § 2253.073(a) (West 2016). Suit may be brought under the McGregor Act for "(1) the unpaid balance of the beneficiary's claim at the time the claim was mailed or the suit is brought; and (2) reasonable attorney fees." TEX. GOV'T CODE ANN. § 2253.073(b) (West 2016). "To recover in a suit under Section 2253.073 on a payment bond . . . , a payment bond beneficiary must mail to the prime contractor and the surety written notice of the claim." TEX. GOV'T CODE ANN. § 2253.041(a) (West 2016). "The notice must be accompanied by a sworn statement of account that states in substance: (1) the amount claimed is just and correct; and (2) all just and lawful offsets, payments, and credits known to the affiant have been allowed." TEX. GOV'T CODE ANN. § 2253.041(c) (West 2016).

Dudley and Hartford argue that ACT did not perfect its bond claims because the notices that it sent, though timely, were defective. Specifically, they argue (1) that only one of the notices

19

was sent to Dudley because the remainder of the notices were sent to "RM Dudley Construction, Ltd.," (2) that only one notice sent to Harford indicated that labor or material was provided or delivered to Dudley since the remainder of the notices referenced "RM Dudley Construction, Ltd.," and (3) that the only notice addressed to Dudley did not contain a sworn statement of account.

With respect to payment bond claims, "substantial compliance is all that is required." *Capitol Indem. Corp. v. Kirby Rest. Equip. & Chem. Supply Co.*, 170 S.W.3d 144, 148 (Tex. App.—San Antonio 2005, pet. denied). The McGregor Act "was not intended to set up 'technical tricks, traps, and stumbling blocks to the filing of legitimate notices of claims,' but 'to provide a simple and direct method of giving notice and perfecting claims."' *United Fire & Cas. Co.*, 321 S.W.3d at 27 (quoting *Argee Corp. & Seaboard Sur. Co. v. Solis*, 932 S.W.2d 39, 52–53 (Tex. App.—Beaumont 1995), *rev'd on other grounds*, 951 S.W.2d 384 (Tex. 1997)). Substantial compliance has occurred "when an actor's deviation does not seriously impede the legislative purpose of the statute," that is, when actual notice of the claims are provided. *Id.* at 28.

The record demonstrates that ACT sent several notices to Hartford and "RM Dudley Construction, Ltd." in 2011. When asked about this entity, Richard testified that RM Dudley Construction, Ltd. was "revised or amended [] or changed" to Dudley Construction, Ltd., that the former entity no longer existed, but that the latter entity used the logo from the former entity. Richard testified that he recognized and received ACT's several notice letters. The 2011 notices to Hartford stated that the claim was for materials, referenced the project name, copied "RM Dudley Construction, Ltd." at an address identical to the one for the current entity, contained the

20

amount then just, true, and due, and provided that all lawful offsets and credits had been allowed. The majority of these notices also included sworn statements of account verified by Wilson, along with recent invoices. The last notice, addressed to Hartford and Dudley, included the statutory requirements and provided that the amount of the account was $124,071.97. Thus, the notices sent by ACT substantially complied with the McGregor Act. Accordingly, we overrule this argument.

However, Dudley and Hartford also argue that, even if the bond claims were perfected, the trial court erred in finding that the payment bond claim created "an independent entitlement for ACT to receive payment." This language comes from *Chilton Insurance Co. v. Pate & Pate Enterprises, Inc.*, 930 S.W.2d 877 (Tex. App.—San Antonio 1996, writ denied). While "the McGregor Act does not create an independent entitlement to receive payment," "[a] McGregor Act payment bond, by its own terms, is designed to protect those who supply labor and material." *Id.* at 886–87. The provision for payment is not dependent on the notice, but on the agreement that the notice is based on. *See id.*; *Billy Smith Enters., Inc. v. Hutchison Const., Inc.*, 261 S.W.3d 370, 376 (Tex. App.—Austin 2008, pet. dism'd). Further, "the McGregor Act was intended to be a public-work laborer or materialman's exclusive claim only as against the payment bond itself, but not necessarily against contractors on a public-work project." *Dealers Elec. Supply Co. v. Scroggins Const. Co.*, 292 S.W.3d 650, 655 (Tex. 2009).

A payment bond is "in the amount of the contract." TEX. GOV'T CODE ANN. § 2253.021(c) (West 2016). The jury's finding that the bond claim had been perfected did not, in and of itself, entitle ACT to damages. Here, like the plaintiff in *Chilton*, ACT's claim was based on the provision of materials. *Chilton Ins. Co.*, 930 S.W.2d at 885. However, damages under an

21

agreement were judicially admitted in *Chilton*. That was not the case here. Because ACT never filed a breach-of-contract claim, it was required to prevail on at least one other cause of action in order to recover under the McGregor Act. *See id.*; *Billy Smith Enters., Inc.*, 261 S.W.3d at 377.

While ACT has lost its sworn-account claim on the Tabor Project, it still has a trust-fund claim on that project to be decided on remand. Thus, its payment-bond claim on that project must be remanded for a determination of the amount, if any, based on the outcome of the trust-fund claim.

*(4)    Attorney Fees Must Be Decided on Remand*

Regarding the award of attorney fees, Dudley argues (1) that the trial court erred by refusing to file requested findings of fact and conclusions of law, (2) that ACT was not entitled to attorney fees,[17] (3) that ACT failed to segregate its attorney fees,[18] and (4) that the evidence is legally and factually insufficient to support the amount of the award.

---

[17]Dudley argues that ACT's pleading did not seek Chapter 38 or Section 2253.073 attorney's fees against Richard, individually, and that there was no jury verdict finding Richard individually liable on the suit on sworn account claim. Thus, they contend that the trial court erred in assessing attorney fees against Richard, individually. ACT does not respond to this argument.

Dudley also argues that ACT failed to present its claims. "To recover attorney's fees under chapter 38, 'the claimant must present the claim to the opposing party or to a duly authorized agent of the opposing party,' and 'payment for the just amount owed must not have been tendered before the expiration of the 30th day after the claim is presented.'" *Town Ctr. Mall, L.P. v. Dyer*, No. 02-14-00268-CV, 2015 WL 5770583, at *7 (Tex. App.—Fort Worth Oct. 1, 2015, pet. denied) (quoting TEX. CIV. PRAC. & REM. CODE ANN. § 38.002(2), (3) (West 2015). "No particular form of presentment is required." *Id.* (quoting *France v. Am. Indem. Co.*, 648 S.W.2d 283, 286 (Tex. 1983)). "[A]ll that is necessary is that a party show that its assertion of a debt or claim and a request for compliance was made to the opposing party, and the opposing party refused to pay the claim." *Id.* (quoting *Standard Constructors, Inc. v. Chevron Chem. Co.*, 101 S.W.3d 619, 627 (Tex. App.—Houston [1st Dist.] 2003, pet. denied)). Submission of invoices for materials under contract constitutes sufficient presentment of claims. *See id.*

[18]"A party seeking to recover attorney's fees is 'required to segregate fees between claims for which they are recoverable and claims for which they are not.'" *Gonyea v. Kerby*, No. 10-12-00182-CV, 2013 WL 4040117, at *6 (Tex. App.—Waco Aug. 8, 2013, pet. denied) (mem. op.) (quoting *Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 311 (Tex. 2006)). An exception to the segregation requirement applies when the attorney fees incurred are rendered in connection with claims arising from the same transaction or occurrence and are so interrelated that their

"Texas Rule of Civil Procedure 296 provides a party with the procedural right to request from the trial court written findings of fact and conclusions of law." *Larry F. Smith, Inc. v. The Weber Co.*, 110 S.W.3d 611, 614 (Tex. App.—Dallas 2003, pet. denied) (citing TEX. R. CIV. P. 296). Although timely requested and re-urged, the trial court failed to make findings of fact and conclusions of law. "A trial court's failure to respond to a timely request is error and is presumed harmful unless the record before the appellate court affirmatively shows that the complaining party has suffered no harm." *Id.* "The general rule is that an appellant has been harmed if, under the circumstances of the case, he has to guess at the reason the trial court ruled against him." *Id.* (citing *Sheldon Pollack Corp. v. Pioneer Concrete*, 765 S.W.2d 843, 845 (Tex. App.—Dallas 1989, writ denied)). In such a case, abatement is required.

But, in this case, remand for a new trial is required. "To be entitled to attorney's fees, a party must (1) prevail on a cause of action for which attorney's fees are recoverable, and (2) recover damages." *Dorton*, 262 S.W.3d at 400 (citing *Green Int'l v. Solis*, 951 S.W.2d 384, 390 (Tex. 1997)). Dudley argues that "ACT acted as a defendant against Dudley Construction, Ltd.'s claims for breach of contract." We have found that ACT did not prevail on its claim on sworn account and that it asserted no claim for breach of contract. We have also found that its payment-bond claim[19] does not give rise to an independent entitlement to damages, and that, although the evidence was sufficient to support the jury's verdict on the sworn-account claim, the

---

prosecution or defense entails proof or denial of essentially the same facts. *Id.* On remand, the parties will have an opportunity to further develop the record on these matters.

[19]Attorney fees are available under Section 2253.073(b) of the Texas Government Code. TEX. GOV'T CODE ANN. § 2253.073(b) (West 2016)

trust-fund claim has, as of yet, undetermined damages, because damages were not conclusively proven.[20]

Our findings require this case be remanded for a new trial. Given our disposition, the issue of attorney fees will require re-examination by the trial court. We trust that the trial court will appropriately determine these issues in light of our opinion and existing precedent.

*(5)     The Other Dispositions by the Trial Court Should Stand*

*(a)     No Abuse of Discretion in Not Submitting the Fraud Claim*

Dudley argues that the trial court erred in refusing to submit jury instructions and questions on Dudley's fraud claim. "The trial court has broad discretion in submitting jury questions and instructions." *Byrd v. Estate of Nelms*, 154 S.W.3d 149, 160 (Tex. App.—Waco 2004, pet. denied) (citing *Plainsman Trading Co. v. Crews*, 898 S.W.2d 786, 791 (Tex. 1995)). Thus, "[w]e review a trial court's decision to submit or refuse a particular instruction under an abuse-of-discretion standard." *Id.* (citing *Tex. Dep't of Human Servs. v. E.B.*, 802 S.W.2d 647, 649 (Tex. 1990)). "Pursuant to the Texas Rules of Civil Procedure, a trial court is required to submit questions and instructions that are raised by the pleadings and evidence." *Id.* (citing TEX. R. CIV. P. 278). Thus, "we must determine whether there is any evidence of probative force to raise a fact issue on the material questions presented." *Rente Co. v. Truckers Exp., Inc.*, 116 S.W.3d 326, 330 (Tex.

---

[20]"[A]ttorney's fees are available for a claim that construction trust funds were misapplied if the relief requested is compensation for work performed or materials supplied." *Perry & Perry Builders, Inc. v. Galvan*, No. 03-02-00091-CV, 2003 WL 21705248, at *8 (Tex. App.—Austin July 24, 2003, no pet.) (mem. op.) ("[B]ecause we are reversing the misapplication recovery and remanding the claim for further proceedings, we must reverse the attorney's fee award that was based in part on that theory and remand that issue for further proceedings."); *see Argyle Mech., Inc.*, 156 S.W.3d 685, 688 (Tex. App.—Dallas 2005, no pet.) (reversing and remanding the issue of damages and attorney fees on misapplication of trust fund claim for a new trial).

App.—Houston [14th Dist.] 2003, no pet.) (citing *Latham v. Castillo*, 972 S.W.2d 66, 68 (Tex. 1998)). "If there is any conflicting evidence of probative value, then we must reverse and remand for a jury determination of that issue." *Id.*

The elements of fraud are "a material misrepresentation, which was false, and which was either known to be false when made or was asserted without knowledge of its truth, which was intended to be acted on, which was relied on, and which caused injury." *Zorrilla v. Aypco Constr. II, LLC*, 469 S.W.3d 143, 153 (Tex. 2015) (quoting *Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 47 (Tex. 1998)).

First, Dudley's counterclaim failed to identify the material misrepresentation allegedly made by ACT. On appeal, Dudley argues that ACT made the material misrepresentation that it would provide restrained-joint pipe, that the restrained-joint pipe had been ordered, and that Stroud's second submittal which was approved by the City of Bryan memorialized the misrepresentation.[21] Dudley points to the e-mails sent by Stroud and argue that he strung them along on the delivery date for the restrained-joint pipe. Stroud initially wrote that the pipe was a minimum of two weeks out and, on June 13, 2011, Stroud indicated that he did not have a delivery date for the restrained-joint pipe. He further stated, "As far as I know[,] the pipe is ready. I am working on it[, and] as soon as I get the information[,] I will send it to you." Dudley complains that these statements were made falsely because the restrained-joint pipe had not been ordered by

---

[21]Stroud's second submittal was approved by the City of Bryan and used restrained-joint pipe. All of ACT's bids and submittals contained language stating that all prices were estimates subject to the manufacturer's shipping schedules and availability and that prices were subject to change prior to shipment. The evidence demonstrated that there was no purchase order for the restrained-joint pipe and that Dudley Construction did not agree to pay the prices for that pipe.

25

McWane. The proposed damage question sought delay damages. Ham testified that the delay caused "extended job site overhead, additional dewatering costs, and additional home office overhead," and calculated those amounts for the jury.

Even assuming that there was legally sufficient evidence of a material misrepresentation of information known to be made falsely or without knowledge of its truth, Dudley could not establish the reliance element or its entitlement to damages.

Dudley's claim of fraud involved statements made by Stroud regarding the alleged completion of the order of the restrained-joint pipes and the timeliness of delivery. However, all bids and submittals specifically provided that ACT would not be responsible for delays. The second submittal containing the prices for the restrained-joint pipes incorporated ACT's terms and conditions of sale. These terms disclaimed all express or implied warranties, warned the buyer that it was responsible for the payment for labor and expenses of replacing defective goods, and stated, "No terms and conditions other than the terms and conditions contained in ACT's Proposal and herein shall be binding on ACT unless accepted by ACT in a writing and signed by the ACT Branch Manager." Because no writing from a branch manager guaranteed delivery of restrained-joint pipe on a specific date for an agreed-on price, the evidence was legally insufficient to raise the issue of reliance. *See U.S. Capital Invs., LLC v. Shahbazi*, No. 02-12-00417-CV, 2014 WL 1713464, at *4 (Tex. App.—Fort Worth May 1, 2014, no pet.) (mem. op.). Also, all of the bids and submittals specifically stated, "ACT is not responsible for delays or shortage of product due to causes beyond its reasonable control," and absolved ACT from liability for delay damages. The

26

signed purchase order between Dudley and ACT contemplated the use of slip-joint pipe, and the City of Bryan ultimately accepted the slip-joint pipe.

Because the evidence was legally insufficient to support a jury finding on fraud, the trial court did not abuse its discretion in refusing to submit the fraud question. *See Rente Co*., 116 S.W.3d at 334–35 (citing *Green Int'l, Inc. v. Solis*, 951 S.W.2d 384, 390 (Tex. 1997) (fraud claim fails if no evidence of false representation)).

### *(b)*     *No Issue Preserved by Dudley Relating to the Reclaimed-Water Project*

Dudley also urges several points on appeal that appear to challenge the trial court's judgment with respect to the Reclaimed Water Project. To preserve a complaint that the evidence is legally insufficient where the matter was tried to a jury, the appealing party must have raised the issue in "(1) a motion for new trial; (2) a motion for an instructed verdict; (3) an objection to the submission of a question in the jury charge; (4) a motion for a judgment notwithstanding the verdict; or (5) a motion to disregard the jury's answer to a question in the verdict." *In re E.M*., No. 10-14-00313-CV, 2015 WL 3485317, at *10 (Tex. App.—Waco May 28, 2015, pet. denied) (mem. op.). To complain of factual sufficiency following a jury trial, the party must have raised the matter in a motion for new trial. *Id.*

Dudley did not complain of the jury's verdict on the Reclaimed Water Project, but expressly agreed that the trial court should enter judgment on the Reclaimed Water Project for ACT on the sworn-account and bond claims in the amount of $14,214.20. Thus, to the extent Dudley's appellate briefing can be read to revisit the judgment with respect to the Reclaimed Water Project, we find these complaints unpreserved.

*Conclusion*

As to that portion of the trial court's judgment that ACT recover on its sworn-account claim on the Tabor Project, we reverse and render judgment that ACT take nothing on that claim. As to ACT's trust-fund and payment-bond claims on the Tabor Project, and as to ACT's claim to recover attorney fees, we reverse those portions of the judgment and remand those claims to the trial court to determine the appropriate amount of recovery, if any, on those claims. As to the portion of the trial court's judgment that ACT recover $14,414.20 on its sworn-account, trust-fund, and payment-bond claims on the Reclaimed Water Project, and as to all other rulings and dispositions made in the trial court's judgment and not referenced in this paragraph, we affirm.

Josh R. Morriss, III
Chief Justice

DISSENTING OPINION

Although I agree with the majority's well-reasoned analysis of the legal issues presented in this appeal, I respectfully dissent from its disposition of this appeal. Because we are reversing the trial court's judgment notwithstanding the verdict as to jury question number 13 (substituting damages in the amount of $110,629.70 in place of the jury's zero verdict for ACT's trust fund cause of action) and because ACT did not raise a cross-point on appeal to assert that the evidence was insufficient to support the jury's zero damage answer in response to that question, I believe that Rule 324 of the Texas Rules of Civil Procedure and that Rule 38.2(b)(1) of the Texas Rules

28

of Appellate Procedure require us to render judgment of zero damages on ACT's trust-fund cause

of action.

Rule 324 and Rule 38.2(b)(1) are almost identical in content. Rule 324(c) states,

**Judgment Notwithstanding Findings; Cross-Points.** When judgment is rendered non obstante veredicto or notwithstanding the findings of a jury on one or more questions, the appellee may bring forward by cross-point contained in his brief field in the Court of Appeals any ground which would have vitiated the verdict or would have prevented an affirmance of the judgment had one been rendered by the trial court in harmony with the verdict, including although not limited to the ground that one or more of the jury's findings have insufficient support in the evidence or are against the overwhelming preponderance of the evidence as a matter of fact, and the ground that the verdict and judgment based thereon should be set aside because of improper argument of counsel.
    The failure to bring forward by cross-points such grounds as would vitiate the verdict shall be deemed a waiver thereof . . . .

TEX. R. CIV. P. 324(c). Rule 38.2(b)(1) states,

*(b) Cross points. (1) Judgment notwithstanding the verdict.* When the trial court rendered judgment notwithstanding the verdict on one or more questions, the appellee must bring forward by cross-point any issue or point that would have vitiated the verdict or that would have prevented an affirmance of the judgment if the trial court had rendered judgment on the verdict. Failure to bring forward by cross-point an issue or point that would vitiate the verdict or prevent an affirmance of the judgment waives that complaint. Included in this requirement is a point that: (A) the verdict or one or more jury findings have insufficient evidentiary support or are against the overwhelming preponderance of the evidence as a matter of fact . . . .

TEX. R. APP. P. 48.3(b)(1).

In *Jackson v. Ewton*, the Supreme Court analyzed Rule 324(c) in detail. *Jackson v. Ewton*,

411 S.W.2d 715 (Tex. 1967). *Jackson* involved a lawsuit arising out of an automobile accident.

*Id*. The trial court submitted the case on special issues, and

the jury found that the defendant, Jackson, failed to keep a proper lookout and that this was a proximate cause of the collision. The jury, however, acquitted him of

29

> driving too fast, following too closely, and failing to apply his brakes in time. The jury also found that the plaintiff, Ewton, attempted to make a right turn from the center lane (Special Issue No. 15), that this was negligence (Special Issue No. 16), and a proximate cause of the collision (Special Issue No. 17).

*Id*. at 716. In response to Ewton's motion for JNOV, "[t]he trial court disregarded the finding to Special Issue No. 17 only, and rendered judgment notwithstanding the verdict for the plaintiffs Ewton." *Id*. The court of appeals reversed the trial court's JNOV, finding that sufficient evidence to support the jury's answer to Special Issue No. 17 was presented. *Id*. at 717. It remanded the case for a new trial "on the ground that the case had not been fully developed and that justice would be better served thereby." *Id*.

> The Supreme Court noted that the purpose of Rule 324

> was to require a final disposition of the case by the appellate court, where a judgment notwithstanding the verdict is erroneously rendered by the trial court, on the basis of the record before it, and to order a remand only as to questions that require the taking of additional evidence, such as jury misconduct.

*Id*. at 718. The Supreme Court then held that remand for a new trial was not proper because the case did not require the taking of additional evidence "which [the parties] had no opportunity to develop in the trial court, such as jury misconduct." *Id*. at 719. Rather, the Supreme Court held that remanding the case for a new trial "would merely afford [the plaintiffs] an opportunity for another 'bite at the apple.'" *Id*. Accordingly, the Supreme Court reversed the judgment of the court of appeals and rendered judgment on the jury's original verdict that the plaintiffs take nothing. *Id*.

30

Most significantly, the Supreme Court distinguished between "counter-points" and "cross-points" on appeal, and held that counter-points are not sufficient to bring the parties within the exception to Rule 324. *Id*. at 717. The Supreme Court then held,

> The Ewtons did file three counter-points in the Court of Civil Appeals; however, they filed no cross-points, i.e., points asserting error committed against them on the trial. Their three counter-points asserted, in effect, that the trial court properly disregarded the jury's answer to Special Issue No. 17 and properly entered judgment notwithstanding the verdict because there was no evidence to support the jury's finding that his negligence in turning was a proximate cause of the collision, there was no proximate cause as a matter of law, and there was no evidence to support the submission of Special Issue No. 17.

*Id*. at 717–18. Consequently, the Supreme Court held that it is not enough that an appellee defended the trial court's JNOV in its reply brief by challenging the sufficiency of the evidence supporting the jury's original verdict. Rather, the appellee must assert insufficiency as a cross-point of error. If the court of appeals reverses the trial court's JNOV and the appellee has not asserted insufficiency of the evidence in a cross-point of error, Rule 324 requires the court of appeals to render judgment in harmony with the jury's original verdict.

In the present case, ACT did not raise any cross-points on appeal. Under the Supreme Court's ruling in *Jackson*, the fact that ACT may have asserted that the evidence was insufficient to support the jury's zero damages response to question 13 in its reply brief does not satisfy Rule 324(c)'s or Rule 38.2(b)'s cross-point requirements. Consequently, I believe we must render judgment that ACT take nothing on its trust-fund cause of action consistent with the jury's response to question 13. Moreover, because I believe that judgment should be rendered that ACT take nothing on its trust-fund claim regarding the Tabor Project, then it follows that we should also render judgment that ACT take nothing on the payment-bond claim on that project as well.

31

Accordingly, I would hold that ACT should have judgment in the amount of $14,214.20 for its sworn-account claim against Dudley on the Reclaimed Water Project. I would also hold that ACT take nothing on all of its other claims against Dudley. Finally, because ACT prevailed on its sworn-account claim against Dudley as to the Reclaimed Water Project, and because attorney fees are recoverable for a suit on sworn account,[22] I would address Dudley's points of error regarding the award of attorney fees.

Ralph K. Burgess
Justice

Date Submitted:     March 29, 2016
Date Decided:       July 14, 2016

_____

[22]*See* TEX. CIV. PRAC. & REM. CODE § 38.001(7) (West 2015).

32