# IN THE SUPREME COURT OF TEXAS

No. 16-0651

DUDLEY CONSTRUCTION, LTD., RICHARD MARK DUDLEY, AND
HARTFORD FIRE INSURANCE COMPANY, PETITIONERS,

v.

ACT PIPE AND SUPPLY, INC., RESPONDENT

ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE SIXTH DISTRICT OF TEXAS

**Argued December 5, 2017**

JUSTICE BROWN delivered the opinion of the Court.

JUSTICE BLACKLOCK did not participate in the decision.

This case presents two questions. The first is procedural: Did ACT Pipe and Supply, Inc., in defending a favorable judgment notwithstanding the jury's verdict, successfully raise a "cross-point" in the court of appeals that preserved an alternative argument proscribing the jury's original verdict? We say yes—ACT did not formally label its argument a "cross-point," but the substance of that argument, if accepted, would nonetheless vitiate the jury's original verdict. The second presents an issue of statutory interpretation: Are attorney's fees recoverable for a claim brought under the Texas Construction Trust Fund Act? Our answer is no—neither the Act nor Civil Practice and Remedies Code section 38.001 specifically provides for attorney's fees, so they are

unavailable. Accordingly, we affirm the court of appeals' judgment in part, reverse in part, and remand to the trial court for further proceedings.

# I

This appeal stems from a billing dispute between a general contractor and a pipe supplier. Dudley Construction, Ltd., the general contractor, enlisted ACT Pipe and Supply, Inc., as a supplier for two municipal water- and sewer-improvement projects: the Reclaimed Water Project in College Station and the Tabor Project in Bryan. This dispute primarily concerns the Tabor Project.

To assist Dudley in bidding for the Tabor Project, ACT's operations manager, Mark Stroud, quoted prices for the "slip-joint" pipe Dudley anticipated using for the project at $95 per unit of 36-inch and $74.53 per unit of 30-inch pipe. Dudley won the contract, and Stroud ordered the slip-joint pipe from ACT's manufacturer to lock in the quoted prices and ensure timely delivery.

After Stroud placed the order, however, the city rejected the proposed use of slip-joint pipe, insisting the project required "restrained-joint" pipe. Stroud provided Dudley a second proposal, quoting the city's preferred pipe at a more-expensive price of $109.71 per unit of 36-inch and $82 per unit of 30-inch pipe. The city approved Dudley's revised proposal, but ACT never modified the original slip-joint purchase order with the pipe manufacturer. Consequently, Dudley received slip-joint rather than restrained-joint pipe at the job site.

Dudley's project manager, Michael Ham, informed Stroud that Dudley had received the wrong pipe. Stroud advised Ham that restrained-joint pipe was available at a higher cost, but Ham insisted ACT supply the restrained-joint pipe at the same price ACT quoted for the slip-joint pipe.

2

Dudley's owner, Richard Dudley, began working with ACT's regional manager, Curt Murray, to resolve the dispute. After reviewing the project plans, Murray told Dudley he believed that slip-joint pipe met the project's specifications and was allowed under the contract, the city's objections notwithstanding. Dudley subsequently took the position with the city that the Tabor Project contract did not specify which pipe must be used and that slip-joint pipe was adequate. The city relented, agreeing to Dudley's use of slip-joint pipe so long as it was reinforced by external restraints. Dudley agreed. Accordingly, Dudley installed the errantly ordered slip-joint pipe it had already received along with $17,500 worth of external restraints ACT supplied at no cost.

Dudley and ACT could not, however, agree on how much Dudley owed for the pipe. Dudley signed a purchase order on September 14, 2011, for the slip-joint pipe that was ultimately used at the originally quoted price of $95 and $74.53 per 36- and 30-inch unit, respectively. But after the project's completion, ACT billed Dudley for restrained-joint pipe at the second proposal's higher cost. Murray testified at trial that the parties verbally agreed to use the higher-quoted prices to offset cost reductions for pipe used in the Reclaimed Water Project. Dudley denied any such agreement, but nonetheless submitted ACT's invoices for both projects to the cities, which paid Dudley for the full amounts ACT sought. Dudley deposited these payments in its account, but citing the ongoing dispute, paid ACT nothing for either project.

ACT sued Dudley on a sworn account for $143,714.19, the total it claims Dudley owes it for the Tabor and Reclaimed Water projects. Because Dudley did not pay ACT after the cities paid Dudley the amounts due on ACT's invoices, ACT also alleged misapplication of trust funds under the Texas Construction Trust Fund Act (TCTFA). As to ACT's sworn-account claims, the jury found that the prices ACT charged were "in accordance with the agreement" for the Reclaimed

Water Project and awarded ACT $14,214.20. For the Tabor Project, however, the jury answered that the prices ACT charged were not "in accordance with the agreement," but nonetheless awarded ACT $110,629.70 for "reasonable compensation." The jury also found ACT perfected a bond-payment claim and awarded the same damages as ACT's sworn-account claims. Finally, the jury found that Dudley misapplied trust funds under the TCTFA but awarded no corresponding damages to compensate ACT for either project.

ACT moved for judgment notwithstanding the verdict. It urged the trial court to change the jury's answer to the sworn-account liability question for the Tabor Project. ACT argued the $110,629.70 damages award necessitated a finding that ACT had indeed charged Dudley "in accordance with the agreement." ACT also encouraged the trial court to disregard the jury's finding that it was not entitled to damages in light of the jury's finding that Dudley misapplied trust funds. ACT asked the trial court to instead substitute the $110,629.70 in damages the jury found for its sworn-account and bond-payment claims.

The trial court granted ACT's motion and issued a final judgment. In its judgment, the court set aside the jury's liability finding on ACT's sworn-account claim for the Tabor Project, instead concluding it was "conclusively proven" that the prices charged by ACT were in accordance with the parties' agreement. The trial court further found that ACT's damages were uncontroverted and conclusively proven, and substituted the jury's $110,629.50 award for the Tabor Project and $14,214.20 for the Reclaimed Water Project under the sworn-account and bond-payment claims in place of the jury's zero-damages findings for TCTFA damages. The judgment awarded ACT $131,823.99 in attorney's fees.

4

Dudley appealed on several grounds. Relevant to the case here, Dudley argued the trial court erred in rendering judgment notwithstanding the verdict on ACT's sworn-account claim because sufficient evidence supports the jury's finding that the price ACT charged for the Tabor Project was not in accordance with the parties' agreement. Dudley also argued the evidence supports the jury's zero-damages finding on ACT's TCTFA claim or, alternatively, that the trial court erred in awarding damages based on the amount the jury awarded for ACT's sworn-account and bond-payment claims. Finally, Dudley argues the trial court improperly awarded attorney's fees.

The court of appeals affirmed in part and reversed in part. 531 S.W.3d 744, 748 (Tex. App.—Texarkana 2016). On the claims relevant to this appeal, it agreed with Dudley that sufficient evidence supported the jury's finding that the prices ACT charged Dudley for the Tabor Project were not in accord with the parties' agreement. *Id.* at 754–55. Accordingly, the court of appeals reversed the trial court's judgment on that issue and rendered judgment that ACT take nothing on its sworn-account claim for the Tabor Project. *Id.* at 754. But it rejected Dudley's argument that the evidence supports the jury's zero-damages finding for ACT's TCTFA claim. *Id.* at 755 (noting Dudley cited no authority to support its argument that "there was no loss of the construction funds" as Dudley held the funds because of "a dispute between the parties due to ACT's overcharges as found by the jury").

The court of appeals concluded, however, that the trial court did not substitute "conclusively proven" TCTFA damages in place of the jury's zero-damages finding when it inserted the jury's $110,629.70 damages awards for the Tabor Project under ACT's sworn-account and bond-payment claims. *Id.* at 756. "From the documentation presented at trial," the court of

5

appeals observed, "it is unclear how the jury reached its decision on the other damage questions, although it is clear that the trial court based its actions on the jury's findings to those questions." *Id.* at 756. The court of appeals therefore held that the trial court erred in determining damages for ACT's TCTFA claim, reasoning that "it does not appear that the obligations of Dudley under any contract yielded exactly $110,629.70." *Id.*

But the court of appeals also took issue with the jury's zero-damages finding: "While the jury found zero damages, we conclude that it was conclusively proven and not really contested that there was some sum of money, more than nothing, that constituted a trust fund under the statute." *Id*. For that reason, the court of appeals reversed the trial court's judgment as to ACT's TCTFA damages and remanded to that court "to determine the appropriate amount of recovery." *Id.* at 754, 762.

A dissenting opinion, however, noted that ACT did not raise a cross-point on appeal asserting that the evidence did not support the jury's zero-damages finding for ACT's TCTFA claim as required by Texas Rule of Civil Procedure 324(c) and Texas Rule of Appellate Procedure 38.2(b)(1). In light of ACT's omission, the dissenting insisted these rules "require us to render judgment of zero damages on ACT's trust-fund cause of action." *Id.* at 762 (Burgess, J., dissenting).

Finally, the court of appeals concluded that any attorney's-fees dispute must be decided on remand. Based on its disposition of the issues before it, the court noted that ACT had yet to establish that it was a prevailing party in an action for which attorney's fees are recoverable. *Id.* at 759. However, noting as well that ACT's TCTFA claim has "as of yet, undetermined damages" to

6

be reconsidered by the trial court, the court of appeals remanded the attorney's-fees issue for "re-examination." *Id.* at 759–60.

We granted Dudley's petition for review.

## II

We first consider whether ACT waived its argument that the court of appeals should not enter judgment on the jury's original verdict after concluding the trial court erroneously rendered judgment notwithstanding the verdict. Like the dissenting opinion at the court of appeals, Dudley argues that two procedural rules—civil-procedure rule 324(c) and appellate-procedure rule 38.2(b)(1)—required the court of appeals to reinstate the jury's zero-damages finding after it concluded the evidence did not support the TCTFA damages award the trial court substituted. The rules are similar in some respects and identical in others. Texas Rule of Civil Procedure 324(c) states:

Judgment Notwithstanding Findings; Cross-Points

When judgment is rendered non obstante verdicto or notwithstanding the findings of a jury on one or more questions, the appellee may bring forward by cross-point contained in his brief filed in the Court of Appeals any ground which would have vitiated the verdict or would have prevented an affirmance of the judgment had one been rendered by the trial court in harmony with the verdict, including although not limited to the ground that one or more of the jury's findings have insufficient support in the evidence or are against the overwhelming preponderance of the evidence as a matter of fact, and the ground that the verdict and judgment based thereon should be set aside because of improper argument of counsel.

The failure to bring forward by cross-points such grounds as would vitiate the verdict shall be deemed a waiver thereof; provided, however, that if a cross-point is upon a ground which requires the taking of evidence in addition to that adduced upon the trial of the cause, it is not necessary that the evidentiary hearing be held until after the appellate court determines that the cause be remanded to consider such a cross-point.

7

TEX. R. CIV. P. 324(c).

Texas Rule of Appellate Procedure 38.2(b) similarly provides:

> (b) *Cross-Points*.
> (1) Judgment Notwithstanding the Verdict. When the trial court renders judgment notwithstanding the verdict on one or more questions, the appellee must bring forward by cross-point any issue or point that would have vitiated the verdict or that would have prevented an affirmance of the judgment if the trial court had rendered judgment on the verdict. Failure to bring forward by cross-point an issue or point that would vitiate the verdict or prevent an affirmance of the judgment waives that complaint. Included in this requirement is a point that:
> (A) the verdict or one or more jury findings have insufficient evidentiary support or are against the overwhelming preponderance of the evidence as a matter of fact; or
> (B) the verdict should be set aside because of improper argument of counsel;
> (2) When Evidentiary Hearing Needed. The appellate court must remand a case to the trial court to take evidence if:
> (A) the appellate court has sustained a point raised by the appellant; and
> (B) the appellee raised a cross-point that requires the taking of additional evidence.

TEX. R. APP. P. 38.2(b).

This Court has previously articulated the upshot of these rules: "Normally, when a trial court has entered judgment notwithstanding the verdict, and an appellate court concludes that this was error, it must reverse the judgment of the trial court and enter judgment in harmony with the verdict, unless the appellee presents by cross-points grounds sufficient to vitiate the jury's verdict or to prevent an affirmance of the judgment had one been entered on the verdict." *Jackson v. Ewton*, 411 S.W.2d 715, 717 (Tex. 1967). And we have clarified the distinction between counter-points and cross-points. Counter-points "assist the appellate court in finding the answers given to the points of the appellant. From the standpoint of the advocate, their function is to show that the point or points of the opposite party are not valid." *Id*. Cross-points, on the other hand, "are really 'points' which are used to preserve error committed by the trial court. They are the means by which

an appellee may bring forward complaints of some ruling or action of the trial court which the appellee alleges constituted error as to him." *Id.*

The *Jackson* court observed that Rule 324(c) serves to "require a final disposition of the case by the appellate court, where a judgment notwithstanding the verdict is erroneously rendered by the trial court, on the basis of the record before it, and to order a remand only as to questions that require the taking of additional evidence, such as jury misconduct." *Id.* at 718. This rule, and its appellate counterpart, promote judicial economy by providing for "one appeal in the case instead of two." *See id.* at 719. If an appellate court agrees with an appellant that the trial court below erroneously set aside the jury's findings and entered its own judgment, the rules have preemptively burdened the appellee to argue any alternative ground that would prevent the appellate court from restoring the jury's answers.

"Cross-points" are the rules-prescribed method for fulfilling this requirement and preserving such alternative arguments against the jury's original verdict. But we have never required rigid technical compliance with these rules. Nor do these rules themselves mandate use of particular labels; a party need not name its arguments "cross-points" to avoid waiver. Whenever possible, we reject form-over-substance requirements that favor procedural machinations over reaching the merits of a case. *See Lane Bank Equip. Co. v. Smith S. Equip., Inc.*, 10 S.W.3d 308, 314 (Tex. 2000) (Hecht, J., concurring) ("Appellate procedure should not be tricky. It should be simple, it should be certain, it should make sense, and it should facilitate consideration of the parties' arguments on the merits."); *see also* TEX. R. CIV. P. 1 ("The proper objective of rules of civil procedure is to obtain a just, fair, equitable and impartial adjudication of the rights of litigants under established principles of substantive law.").

If an appellee makes a substantive argument that would, if accepted, vitiate the jury's original verdict or prevent an affirmance of the judgment had one been rendered in harmony with the jury's verdict, it has presented a cross-point sufficient to avoid waiver. The Fourteenth Court of Appeals has modeled the correct approach, considering arguments as cross-points "even when the appellee does not explicitly refer to them as such." *JJJJ Walker, LLC v. Yollick*, 447 S.W.3d 453, 459 (Tex. App.—Houston [14th Dist.] 2014, pet. denied). If an appellee makes an argument only in response to an appellant's point of error—technically, perhaps, a "counter-point" under the *Jackson* dichotomy—appellate courts should nonetheless consider it a cross-point if, regardless of how or where it is presented, the substance of the argument would nonetheless undermine the jury's original verdict. *See Holman Street Baptist Church v. Jefferson*, 317 S.W.3d 540, 547 Tex. App.—Houston [14th Dist.] 2010, pet. denied ("Although [the appellee] did not explicitly term his . . . arguments as 'cross-points,' he did make . . . arguments [that would have vitiated the verdict] in response to [the appellant's] issues. We will therefore consider these arguments as cross-points and assess the merits of [the appellee's] contentions.").

Without dispute, ACT did not formally label as cross-points any of its arguments to the court of appeals. It did, however, argue in defense of the trial court's judgment notwithstanding the verdict overriding the jury's zero-damages finding for its TCTFA claim. And its basis for doing so was that the trial court acted properly in disregarding a finding that was against the overwhelming weight of the evidence and contrary to the jury's finding that Dudley had misapplied trust funds. ACT insisted that the "overwhelming evidence presented at trial supported entering [judgment notwithstanding the verdict]" on ACT's TCTFA claims. It pointed to "records subpoenaed from each city detail[ing] the amounts [Dudley] submitted in pay applications, which

10

included the materials supplied by [ACT]." These records "included the city's approval of the payment applications and the electronic funds transfer records identifying the dates and amounts of the funds transferred to [Dudley]." Furthermore, "Mr. Dudley admitted that [Dudley] submitted and received approval from the city for pay applications that included the materials for which [ACT] is seeking recovery" and that "he received the funds for [ACT's] materials, as reflected in the city's records." And upon cross-examination, Dudley testified that "the funds he received from the city were 'widely dispersed,' but none were dispersed to [ACT]." This evidence, ACT insists, "conclusively establishes" its entitlement to damages for its TCTFA claim. Accordingly, ACT asked the trial court to disregard the jury's zero-damages finding and enter "the same damage amounts the jury found in response to damages questions" for ACT's sworn-account and bond-payment claims.

Dudley concedes that ACT's failure to label its argument as a "cross-point" is not fatal but insists ACT ultimately failed to preserve its argument because it substantively presented only a counter-point to Dudley's argument that the trial court improperly granted judgment notwithstanding the verdict. But ACT defends the trial court's decision precisely because it repudiates the jury's zero-damages finding. ACT's argument that "the evidence conclusively establishes ACT's entitlement to damages" and what Dudley insists it should have argued—that the overwhelming weight of the evidence is against the jury's verdict—are two sides of the same coin: to defend the judgment notwithstanding the verdict because the evidence is overwhelmingly against the jury's verdict *is* to attack the verdict. Whether *Jackson* would classify ACT's argument a "counter-point" or a "cross-point," its substance is unmistakable: the evidence commands at least some damages.

11

The court of appeals permissibly considered ACT's argument a "cross-point," noting that "[w]hile ACT has not explicitly set out or named any of its appellate points as 'cross-points,' it has substantively made arguments that, if accepted, vitiate the original jury verdict of zero damages." 531 S.W.3d at 756 n.16. Accordingly, it remanded the issue to the trial court "to determine the appropriate amount of recovery." *Id.* at 754, 762. Dudley argues, however, that under *Jackson* a remand is improper because "this case does not require the taking of new evidence which the parties had no opportunity to develop in the trial court." *See Jackson*, 411 S.W.2d at 718 ("The purpose of [rule 324(c)] was to require a final disposition of the case by the appellate court, where a judgment notwithstanding the verdict is erroneously rendered by the trial court, on the basis of the record before it, and to order a remand only as to questions that require the taking of additional evidence, such as jury misconduct."). On this point, we believe *Jackson*—issued more than forty years ago—may have overstated the constraints of rule 324(c) and, by implication, appellate-procedure rule 38.2(b).

Clearly, the thrust of these rules is to require appellees to present any alternative arguments that would prevent the court of appeals from reinstating the jury's verdict should it agree with the appellant that the trial court erred in rendering judgment notwithstanding the verdict. One purpose of this requirement might be to better position courts of appeals to finally dispose of cases instead of remanding them to trial courts for further proceedings. But nothing in the text of either rule compels the conclusion that a final disposition in the court of appeals is required or that a remand is always limited to instances in which new evidence must be taken. Under the circumstances here, we cannot say the court of appeals erred in remanding the case to the trial court for reconsideration of ACT's TCTFA damages. *See, e.g.*, *Texarkana Mem'l. Hosp., Inc. v. Murdock*, 946 S.W.2d 836,

837 (Tex. 1997) ("Because there is no evidence to support the entire amount of damages awarded by the jury, but there is legally sufficient evidence that [the defendant's] negligence caused some of the medical expenses, we reverse the judgment of the court of appeals and remand the cause for a new trial.").

We therefore affirm the court of appeals' decision on this issue and agree the case should be remanded to the trial court for further proceedings. We acknowledge, however, that the parties disagree as to the scope of the court of appeals' remand. Indeed, language in the court of appeals' opinion can be read to suggest that a new trial is required. But the opinion also states that the trial court may "determine the appropriate amount of recovery," suggesting that the trial court could simply alter its judgment in conformance with evidence already in the record. 531 S.W.3d at 754, 762. Rather than attempt to interpret the scope of remand the court of appeals intended, we will simply remand the case to the trial court for further proceedings in light of the holdings of the court of appeals and of this Court. The court of appeals properly reversed the trial court's judgment regarding ACT's TCTFA damages—no evidence supports the damages that the trial court substituted. We further agree with the court of appeals that "it was conclusively proven and not really contested that there was some sum of money, more than nothing, that constituted a trust fund under the statute." *Id.* at 756. Beyond that, we leave the next step, including whether a new trial is necessary, to the trial court's sound discretion.

### III

Dudley raised several arguments at the court of appeals against the attorney's-fees award in ACT's favor. The court of appeals did not consider Dudley's arguments, choosing instead to remand the attorney's-fees issue to the trial court for reconsideration in light of the court of

13

appeals' disposition of other issues. In doing so, however, the court of appeals suggested that attorney's fees for a TCTFA claim "are available for a claim that construction trust funds were misapplied if the relief requested is compensation for work performed or materials supplied." *Id.* at 759 n.20 (quoting *Perry & Perry Builders, Inc. v. Galvan*, No. 03-02-00091-CV, 2003 WL 21705248, at \*8 (Tex. App.—Austin July 24, 2003, no pet.) (mem. op.)). Accordingly, because ACT's TCTFA claim has "as of yet, undetermined damages, because damages were not conclusively proven," the court of appeals remanded the attorney's-fees issue for "re-examination" by the trial court. 531 S.W.3d at 759–60.

Dudley insists, however, that attorney's fees are unavailable under the TCTFA and that the court of appeals therefore erred in remanding the issue for reconsideration on that ground. Without question, the TCTFA says nothing about attorney's fees. *See* TEX. PROP. CODE §§ 162.001–.033; *see also In re Kirk*, 525 B.R. 325, 334 (Bankr. W.D. Tex. 2015) ("Th[e] [TCTFA] does not, however, mention recovery of attorney's fees in such actions."). On this point we have been clear: "For more than a century, Texas law has not allowed recovery of attorney's fees unless authorized by statute or contract." *Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 310 (Tex. 2006).

Some courts of appeals, however, have held that Civil Practice and Remedies Code section 38.001 nonetheless makes attorney's fees available for a claim brought under the TCTFA. In *Perry & Perry Builders, Inc. v. Galvan*, the court of appeals likened Galvan's TCTFA claim to his quantum-meruit claim, reasoning that "[i]n both claims, [Galvan] seeks payment for work performed on the construction project" and "does not seek recovery under any consequential or punitive tort damage theory." 2013 WL 21705248, at \*8. "Like quantum meruit," the court reasoned, "his request for an award equal to the amount of funds that were intended to compensate

14

him for work provided is within the statute authorizing an award of attorney's fees." *Id.* (citing TEX. CIV. PRAC. & REM. CODE § 38.001); *see also Direct Value, L.L.C. v. Stock Bldg. Supply, L.L.C.*, 388 S.W.3d 386, 394 (Tex. App.—Amarillo 2012, no pet.) (following *Galvan* as binding precedent in a case originally appealed to the Austin court of appeals but transferred to the Amarillo court of appeals). Similarly, in *Ulusal v. Lentz Engineering, L.C.*, the court of appeals held that section 38.001 permits an attorney's-fees award for TCTFA claims because the TCTFA "creates a cause of action for failure to make payments under a construction contract" and attorney's fees are recoverable under section 38.001 for "rendered services, performed labor, furnished materials, and a contract." 491 S.W.3d 910, 919 (Tex. App—Houston [1st Dist.] 2016, no pet.). One court of appeals has rejected this approach, observing simply that "[m]isapplication of trust funds is not one of the causes of action listed in section 38.001, and therefore the section does not apply to [a TCTFA claim]." *Larrison v. Catalina Design*, No. 02-10-00167-CV, 2011 WL 582730, at *5 (Tex. App—Fort Worth Feb. 17, 2011, no pet.) (mem. op.).

We conclude that neither the TCTFA nor Civil Practice and Remedies Code section 38.001 allow for attorney's fees for a successful TCTFA claim. Our reasoning is simple: neither statute says so. *See Chapa*, 212 S.W.3d at 310. True, section 38.001 makes attorney's fees recoverable for a variety of claims that might factually form the basis of a TCTFA claim—a "trustee" under the TCTFA, *see* TEX. PROP. CODE § 162.002, might misapply trust funds at the expense of a beneficiary who has "rendered services," "performed labor," "furnished material," or who was a party to "an oral or written contract." *See* TEX. CIV. PRAC. & REM CODE § 38.001(1)–(3),(8). But this does not merge the statutes for attorney's-fees purposes. Certainly, a pipe supplier might recover attorney's fees under section 38.001 for work performed, materials provided, or for breach

15

of contract. But this does not open the door to attorney's fees for violations of separate statutory provisions simply because the claim is based on the same dispute or because the recovery sought is the same.

The TCTFA is a stand-alone, comprehensive statutory scheme defining whether "construction payments" and "loan receipts" constitute trust funds, *see* TEX. PROP. CODE § 162.001, determining who are "beneficiaries" of trust funds, *see id.* § 162.003, providing for when trust funds are "misapplied," *see id.* § 162.031, and providing for penalties, *see id.* § 162.032. The legislature could have provided for attorney's fees in this scheme. It did not. So neither will we. Nor will we reach to find them implied by a wholly separate statute. *See Travelers Indem. Co. of Conn. v. Mayfield*, 923 S.W.2d 590, 593 (Tex. 1996) ("The authorization of attorney's fees in civil cases may not be inferred; rather it 'must be provided for by the express terms of the statute in question.'" (quoting *First City Bank-Farmers Branch v. Guex*, 677 S.W.2d 25, 30 (Tex. 1984))).

In so far as the court of appeals' remand to consider attorney's fees included fees for ACT's TCTFA claim, we reverse its judgment and render judgment that attorney's fees for a TCTFA claim are not recoverable under either the TCTFA itself or Civil Practice and Remedies Code section 38.001.

* * *

On the issue of whether ACT preserved its argument that judgment should not be entered on the jury's verdict, we affirm the court of appeals' judgment. On the issue of the availability of attorney's fees for ACT's TCTFA claim, we reverse the court of appeals' judgment and render judgment that attorney's fees are unavailable. We remand the case to the trial court for further proceedings consistent with this opinion.

16

_____
Jeffrey V. Brown
Justice

OPINION DELIVERED:  April 6, 2018